# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT A. DIEZ,

        Plaintiff/Counter-Defendant-
        Appellant,

v

MARIE-JESUSA CLOMA DAVEY,

        Defendant/Counter-Plaintiff-
        Appellee.

FOR PUBLICATION
October 23, 2014
9:05 a.m.

No. 318910
Macomb Circuit Court
Family Division
LC No. 2010-002362-DC

Before: HOEKSTRA, P.J., and WILDER and FORT HOOD, JJ.

HOEKSTRA, P. J.

In this child custody dispute, plaintiff/counter-defendant, Robert A. Diez ("plaintiff"), appeals as of right the trial court order resolving issues involving child custody and parenting time, child support, and attorney fees. Because the trial court's award of custody and parenting time was not an abuse of discretion and the trial court did not abuse its discretion in awarding attorney fees to defendant/cross-plaintiff, Maria-Jesusa Cloma Davey ("defendant"), we affirm those portions of the trial court's judgment. However, for the reasons explained below, we vacate the trial court's award of child support and remand for reconsideration of plaintiff's income under the Michigan Child Support Formula (MCSF).

## I. BACKGROUND

Plaintiff is the president and sole shareholder of Supreme Gear Company ("SGC"), a small business manufacturer of precision gears used in the aerospace industry. SGC is organized as a corporation and it has elected to be an S Corporation for tax purposes under 26 USC § 1362(a)(1). The parties in this case met in 1994 and became romantically involved. They never married, but, over the course of a 16 year relationship, they had three children together.

After their relationship ended, plaintiff filed the present lawsuit in April 2010, seeking sole legal and physical custody of the three minor children. Following more than three years of litigation, on July 2, 2013, the trial court issued an opinion and order addressing the issues of (1) custody and parenting time, (2) child support, and (3) defendant's request for attorney fees. First, regarding custody and parenting time, the trial court awarded the parties joint legal and joint physical custody. The parenting time schedule provided defendant with approximately 122

overnights per year, consisting of alternate weekends from Friday to Monday morning, alternate weeks in the summer, parenting time during spring break, and holiday parenting time pursuant to the 16th Circuit Judicial Reasonable Parenting Time Schedule.

On the issue of child support, the trial court credited the testimony of an expert, CPA Justin Cherfoli, who opined that plaintiff had an average income of $723,000 over the course of three years, from 2009 through 2011. Included within this calculation of income were plaintiff's wages, distributions from SGC, "perks" such as car expenses paid by SGC, and a portion of "excess working capital" retained in SCG, meaning those amounts that, in Cherfoli's judgment, plaintiff could withdraw from the S-Corporation while maintaining a viable business. Based on this, and accounting for defendant's income and plaintiff's award of 122 overnights, the trial court set plaintiff's monthly child support at $7,062.

Lastly, in regard to attorney fees, the trial court found that defendant was unable to bear her legal expenses, and that plaintiff should pay all defendant's attorney fees. After defendant submitted a bill of costs, the trial court awarded defendant $118,000 in attorney fees. In October 2013, a judgment reflecting the trial court's opinion and order regarding custody and child support as well as the award of attorney fees was entered. Plaintiff now appeals as of right.

## II. CHILD SUPPORT

On appeal, plaintiff challenges the child support order entered by the trial court. In particular, plaintiff disputes whether the trial court erred in relying on an expert's determination of "excess working capital" in the S-Corporation as a basis for attributing income to plaintiff. He also contends that the trial court erred by including within its calculation of plaintiff's income funds distributed to plaintiff by SGC for purposes of paying the tax burden attributable to SGC's corporate income.

Relevant to plaintiff's arguments, the FOC referee held an evidentiary hearing on the topic of child support. The hearing took place over the course of three days, and it involved testimony from both parties and three certified public accountants who testified as experts. The experts reached various conclusions regarding plaintiff's actual income available for the payment of child support in the years 2008 through 2011, but, ultimately, the referee and trial court both relied on the opinion of Justin Cherfoli when determining plaintiff's income.

According to his testimony, Cherfoli estimated plaintiff's income as follows: $1,145,000 in 2011, $637,000 in 2010, $391,000 in 2009, and $2,116,000 in 2008. As a result, he offered a three year average of $723,000 and a four year average of $1,071,000. He arrived at his determinations of plaintiff's income by considering plaintiff's W-2 income, interest and dividends, actual distributions, perks, and "additional monies available for income, or for payment of child support that aren't in any of the other four categories." Cherfoli included in his calculations for 2008 the amount distributed for the purchase of the Holly house and, for all years, those sums from the company distributed to plaintiff for what plaintiff and his accountant testified was payment of SGC's taxes. In the final category, i.e. "additional monies," Cherfoli placed a portion of what he characterized as "excess working capital." Specifically, he defined "working capital" as current assets—including cash, accounts receivable, and inventory—less current liabilities. He then considered what money was required to pay for the operations of the

manufacturing side of the company and any amount beyond this, he considered "excess working capital," or, in other words, those funds beyond what he deemed to be required to meet SGC's ongoing operating expenses. Using calculations known as the "Bardahl analysis," Cherfoli calculated excess working capital of $300,000 in 2010 and $797,000 in 2011. Based on his own judgment, he concluded that 60 to 65 percent of SGC's excess working capital was available for distribution in a given year. Thus, in his opinion, an additional $200,000 could have been distributed in 2010 and an additional $460,000 could have been distributed in 2011. He did not discern any distributable excess working capital in 2009.

By his own admission, Cherfoli had no study to support the percentages he chose as appropriate distributions of excess working capital. He based the numbers on his own opinion of what he viewed as "reasonable" when compared with the business's requirements. In doing so, he compared SGC with other corporations, noting that SGC operated under a more "conservative" business model insofar as it had "more cash and less debt than" other companies in the same industry. Compared to other companies, SGC had 22 percent of its total assets in cash and a zero debt-to-capital ratio, while others had 6 percent of total assets in cash and an average debt-to-capital ratio of 20 percent. Cherfoli further opined that distribution of additional capital would not hinder SGC's operations because many of SGC's purchases of needed equipment could be financed by acquiring new debt, rather than adhering to SGC's historical practice of purchasing equipment with cash.[1]

Following the hearing, the FOC recommended that plaintiff be ordered to pay $8,806 a month in child support. In arriving at this figure, the FOC accepted Cherfoli's opinions and determined that plaintiff had an average monthly gross income, for 2010 and 2011, of $74,117.13, or $889,405.56 per year. Included in these figures were amounts paid to plaintiff for the purpose of satisfying SGC's tax liability. The FOC concluded that taxes owing by SGC were plaintiff's liability.[2]

---

[1] Regarding the purchase of equipment, plaintiff testified that the aerospace industry, for which SGC manufactures gears, is "majorly capital intensive" and requires the regular purchase of new machinery to stay current in order to continue receiving contracts. According to plaintiff, these equipment purchases, which occur almost every year, can range anywhere from a few hundred thousand dollars to upwards of $2,000,000 per machine. Thus, in plaintiff's view, to stay competitive, particularly against larger manufacturing companies with more assets, the corporation needs cash on hand to purchase the necessary new equipment.

[2] The FOC indicated that plaintiff's attorney stipulated that the amounts paid in taxes for SGC should be included in plaintiff's gross income. While counsel did so stipulate, in context, it is abundantly clear from the record that counsel in no way intended to stipulate to the funds inclusion for purposes of determining plaintiff's child support obligations. Plaintiff's counsel argued repeatedly, and presented expert testimony to the effect, that taxes paid for income attributable to SGC should not be considered income to plaintiff for purposes of calculating child support.

Plaintiff objected to the FOC's recommendation, and the matter was considered by the trial court. The trial court acknowledged that it must conduct a de novo review, but framed the matter as whether the referee "erred in crediting Cherfoli's expert testimony" and ultimately found no error in the referee's reliance on Cherfoli's testimony. Specifically, the trial court concluded that "Michigan law treats the income of an S corporation as the income of the S Corporation's shareholders" and, for this reason, "Cherfoli properly treated the income of plaintiff's S corporation as plaintiff's income." Indeed, the trial court concluded that Cherfoli's analysis "worked to plaintiff's advantage" because Cherfoli considered only "excess working capital" rather than all of SGC's income as income available for distribution. Agreeing with the referee that Cherfoli was the most credible expert, the trial court accepted Cherfoli's calculation of "excess working capital" and his conclusion that 60 to 65 percent of "excess working capital" was available for distribution. In accepting Cherfoli's annual figures, the trial court made no findings regarding whether these figures included amounts dispersed for payment of SGC's taxes. Unlike the referee, the trial court used the average of three years, rather than a two year average used by the FOC, resulting in a gross income of $723,000, and ultimately, a net monthly income of $35,712. Based on this, and accounting for defendant's income and plaintiff's award of 122 overnights, the trial court set plaintiff's child support at $7,062 per month.

## A. STANDARD OF REVIEW

On appeal, this Court reviews child support orders for an abuse of discretion. *Malone v Malone*, 279 Mich App 280, 284; 761 NW2d 102 (2008). In contrast, we review the trial court's factual findings for clear error. *Borowsky v Borowsky*, 273 Mich App 666, 672; 733 NW2d 71 (2007). Issues involving statutory interpretation or the proper interpretation of the MCSF pose questions of law which we review de novo. *Id.* As when interpreting statutes, this Court must ensure compliance with the plain language of the MCSF and may not read anything into the MCSF that is not present. *Peterson v Peterson*, 272 Mich App 511, 518; 727 NW2d 393 (2006). Whether the trial court properly applied the MCSF to the facts of the case also presents a question of law that we review do novo. *Clarke v Clarke*, 297 Mich App 172, 179; 823 NW2d 318 (2012).

## B. THE MCSF & CORPORATE INCOME

Parents of a minor child have a well-recognized obligation to support that child. *Shinkle v Shinkle (On Rehearing)*, 255 Mich App 221, 225; 663 NW2d 481 (2003), citing MCL 722.3. By statute, excepting those factual instances where application of the MCSF would be unjust or inappropriate, a parent's child support contribution is determined by use of the formula provided in the MCSF. MCL 552.605(2). See also *Clarke*, 297 Mich App at 179. That is, the MCSF has the force of law insofar as, by statute, a trial court is presumptively required to order child support in an amount determined by application of the child support formula. MCL 552.605(2); *Stallworth v Stallworth*, 275 Mich App 282, 284; 738 NW2d 264 (2007). See also 2013 MCSF 1.01(B) ("Unless rebutted by facts in a specific case, the law presumes that [the MCSF] sets appropriate levels of support.").

The MCSF was designed "based upon the needs of the child and the actual resources of each parent." MCL 552.519(3)(a)(*vi*). Pursuant to the MCSF the first step in calculating each parent's support obligation involves determination of both parents' individual incomes. 2013

MCSF 2. "The objective of determining net income is to establish, as accurately as possible, how much money a parent *should* have available for support." 2013 MCSF 2.01(B) (emphasis added). The MCSF directs that "[a]ll relevant aspects of a parent's financial status are open for consideration when determining support," 2013 MCSF 2.01(B), and a parent's income calculated under the MCSF "will not be the same as that person's take home pay, net taxable income, or similar terms that describe income for other purposes," MCSF 2.01(A).

Specifically included within "income" for purposes of child support calculations are numerous itemized sources of compensation and financial gain. See 2013 MCSF 2.01(C). Most relevant to the present dispute, income includes: "Earnings generated from a business, partnership, contract, self-employment, or other similar arrangement, or from rentals." 2013 MCSF 2.01(C)(2). More particularly, the MCSF includes a list identifying forms of compensation to which courts should pay particular attention when endeavoring to calculate the income of a business owner, executive, or self-employed individual. 2013 MCSF 2.01(E)(4). These forms of compensation include:

(a) Distributed profits, profit sharing, officers' fees and other compensation, management or consulting fees, commissions, and bonuses.

\* \* \*

(d) Reduced or deferred income. Because a parent's compensation can be rearranged to hide income, determine whether unnecessary reductions in salaries, fees, or distributed profits have occurred by comparing amounts and rates to historical patterns.

(i) Unless the business can demonstrate legitimate reasons for a substantial reduction in the percentage of distributed profits, use a three-year average to determine the amount to include as a parent's income.

(ii) Unless a business can demonstrate legitimate reasons for reductions (as a percentage of gross business income) in salaries, bonuses, management fees, or other amounts paid to a parent, use a three-year average to determine the amount to include as a parent's income. [2013 MCSF 2.01(E)(4).]

In considering the various sources of income a business owner or self-employed individual may possess, the MCSF expressly recognizes, and discusses, an inherent difficulty in ascertaining income for these individuals. 2013 MCSF 2.01(E)(1). This difficulty arises because:

(a) These individuals often have types of income and expenses not frequently encountered when determining income for most people.

(b) Taxation rules, business records, and forms associated with business ownership and self-employment differ from those that apply to individuals employed by others. Common business documents reflect policies unrelated to an obligation to support one's child.

(c) Due to the control that business owners or executives exercise over the form and manner of their compensation, a parent, or a parent with the cooperation of a business owner or executive, may be able to arrange compensation to reduce the amount visible to others looking for common forms of income. [2013 MCSF 2.01(E)(1).]

Given the potential for manipulation, and the close connection between a parent's finances and that of a parent's business, "[i]n order to determine the monies that a parent has available for support, it may be necessary to examine business tax returns, balance sheets, accounting or banking records, and other business documents to identify any additional monies a parent has available for support that were not included as personal income." 2013 MCSF 2.01(E)(2).

When undertaking this analysis, which must necessarily be undertaken on a case-by-case basis, it is apparent from the MCSF that a parent's historical business practices should be given considerable weight in assessing the parent's income from a business. For example, the MCSF places significant emphasis on the parent's historical receipt of income and distributions from business earnings, instructing courts to consider "historical patterns," as a percentage of gross profits, when considering whether reduced or deferred income and distributions are available as "income." 2013 MCSF 2.01(E)(4)(d). Similarly, the MCSF states that, in determining what business earnings may be attributed to a parent, "[i]ncome (or losses) from a corporation should be carefully examined to determine the extent to which they were *historically* passed on to the parent or used merely as a tax strategy." 2013 MCSF 2.01(C)(2)(a) (emphasis added). Such historical analysis may often make clear whether the parent has used the business in an effort to shield money from consideration for child support purposes, thereby enabling courts to determine what income should be available to parents. See 2013 MCSF 2.01(E)(1)(c).

While providing general directives regarding the consideration of business earnings, the MCSF does not expressly reference S corporations or provide explicit directions on how earnings generated by an S corporation, and retained by the corporation or distributed for payment of taxes, should be considered. Relevant to this analysis, an S corporation is a small business which has elected, under 26 USC § 1362(a)(1), to be an S corporation for tax purposes. The effect of such election is that the corporation's income and losses "pass through to the individual shareholders as if the income and losses belonged to the members of a partnership." *Ross v Auto Club Group*, 481 Mich 1, 9; 748 NW2d 552 (2008). See also 26 USC § 1366(b), (c). The benefit of S corporation election from a tax perspective is that the corporation may avoid federal taxation at the corporate level. See *Chocola v Dep't of Treasury*, 422 Mich 229, 236; 369 NW2d 843 (1985).

Although the income of an S corporation is treated, for tax purposes, as belonging to the shareholders, see 26 USC § 1366, it does not follow that the S corporation must actually distribute its earnings to the shareholders. See *JS v CC*, 454 Mass 652, 661 n 10; 912 NE2d 933 (2009); *In re Marriage of Brand*, 273 Kan 346, 351; 44 P3d 321 (2002). In practice, an S corporation may retain earnings, but distribute some funds to the individual shareholders to enable them to meet those tax liabilities attributable to the S corporation's earnings. See, e.g., *Tebbe v Tebbe*, 815 NE2d 180, 183 (Ind Ct App 2004). While an S Corporation is not required to disburse income to shareholders, it is notable that a sole shareholder of such a corporation is, in particular, uniquely situated insofar as he or she possess power over corporate funds not

enjoyed by an average employee and may, given this power, be especially able to manipulate the distribution of income, or lack thereof, from the corporation. See *JS*, 454 Mass at 663; *Taylor v Fezell*, 158 SW3d 352, 358 (Tenn 2005).

## C. ANALYSIS

Considering the plain language of the MCSF and the manner in which S corporations function, the question presented in the determination of plaintiff's income in this case is twofold. First, we must decide to what extent, if any, undistributed earnings retained by an S corporation may be included as income to shareholders for purposes of calculating the individual's income under the MCSF. To resolve this issue in this case, we specifically consider whether the trial court erred in relying on Cherfoli's determination, regarding the portion of "excess working capital" in the S-Corporation available for distribution, as a basis for attributing additional income to plaintiff. Second, we must also decide whether money distributed by the S corporation to individual shareholders to meet the tax burden arising from the S corporation's income can be attributed to the individual as income for child support purposes.

### *i*. RETAINED EARNINGS

We begin our consideration of earnings retained by the corporation by turning to the MCSF. Reviewing the list of the various types of income that are specified in the MCSF for inclusion in a parent's income, we see no mention of earnings retrained by an S Corporation as a type of earning that must, in all cases, be included when calculating a parent's income. For instance, generally, the MCSF includes within income "earnings generated from a business." 2013 MCSF 2.01(C)(2). However, when earnings generated by a corporation are at issue, it is apparent that not all such earnings can categorically be included as income to a parent because such earnings are not always attributable, or available, to a parent. Corporations, even when owned by a sole shareholder, are separate entities under the law, see *Lakeview Commons v Empower Yourself*, 290 Mich App 503, 509; 802 NW2d 712 (2010), and undistributed profits are said to "belong to the corporation," see *Dodge v Ford Motor Co*, 204 Mich 459, 497; 170 NW 668 (1919); *In re Marriage of Brand*, 273 Kan at 351. Thus, with regard to corporate income, the MCSF cautions that "income . . . from a corporation should be carefully examined to determine the extent to which they were *historically passed on to the parent*." 2013 MCSF 2.01(C)(2)(a) (emphasis added). This directive makes plain that all corporate earnings cannot be unconditionally attributable to a parent; rather, there must be some consideration of whether a parent receives, or has historically received, those funds. In particular, the MCSF clearly requires inclusion of *distributed* profits as income to a parent, 2013 MCSF 2.01(E)(4)(a), and it plainly requires consideration of undistributed profits where there has been a substantial *reduction* in the percentage of profits distributed to a parent as compared to historical patterns of distributions, 2013 MCSF 2.01(E)(4)(d)(*i*). Nowhere, however, does the MCSF identify undistributed corporate profits as income to a parent where there is no evidence of a reduction in distributions compared to historical practices. Given that the MCSF does not expressly include this class of corporate earnings within a parent's income, where there is no evidence of a reduction in distributions compared to historical practices, it would be inappropriate to adopt a brightline rule including undistributed earnings retained by an S corporation within the calculation of a parent's income under the MCSF in all circumstances.

Cherfoli's opinion, on which the trial court relied, appeared to recognize that not all earnings retained by an S-Corporation may be attributed to shareholders as income in every circumstance. Cherfoli instead focused his analysis on a subclass of these retained earnings, which he characterized as "excess working capital." He judged that, in this case, 60 to 65 percent of this "excess working capital" could be distributed and he thus deemed these amounts available as income to plaintiff for child support purposes. The broader question presented thus becomes whether the MCSF requires calculation of a parent's income as though he or she operates a business in a particular manner and distributes some specific percentage of "excess" profits. We see no such requirement in the MCSF.

Quite simply, nothing in the plain language of the MCSF indicates a parent should be imputed with income as though he or she runs his or her business in line with industry averages, or that he or she should be charged with income as though some set percentage of "excess working capital" had been distributed. Rather, the focus in the MCSF regarding the analysis of undistributed profits as income centers on the manipulation of income as discerned through analysis of the historical conduct of the corporation and the parent regarding the distribution of profits. See 2013 MCSF 2.01(C)(2)(a); 2013 MCSF 2.01(E)(4)(d). Stated differently, while the MCSF ultimately seeks to discover what monies a parent "has available" and *should* have available as income, 2013 MCSF 2.01(B), (E)(2), it does not mandate the pursuit of one reasonable business model over another, and it does not necessitate the revamping of a parent's reasonable and historical business practices in favor of alternative methods in which a corporation *could* theoretically be run in order to make additional funds available.

Instead, as a general proposition, the management of a corporation, or any business, obviously involves some exercise of business judgment, see *Churella v Pioneer State Mut Ins Co*, 258 Mich App 260, 270; 671 NW2d 125 (2003), and the MCSF gives no indication that it intended to unilaterally interfere with this business judgment. A corporation is, as noted, a separate entity under the law, *Lakeview Commons*, 290 Mich App at 509, and its continued viability depends on both its compliance with corporate law and its maintenance of capitalization sufficient to meet ordinary expenses and further its business purposes, *Taylor*, 158 SW3d at 358. A corporate business owner, and in particular a sole shareholder, while able to distribute profits to himself, nonetheless faces business expenses and concerns, including a financial responsibility to his creditors and employees, not encountered by most parents. See 2013 MCSF 2.01(E)(1)(a) (recognizing unique business expenses encountered by business owners); *Zold v Zold*, 880 So 2d 779, 781 (Fla Dist Ct App 2004), approved 911 So 2d 1222 (2005). In this role, a business owner must exercise judgment in the determination of what funds are required to maintain the business over time and what funds are available for distribution to shareholders; and, as a general matter, funds retained for necessary and legitimate business reasons are not available to the parent and need not be included as income under the MCSF. See 2013 MCSF 2.01(E)(1)(d) (considering whether reductions in corporate distributions, i.e., increased retention of profits, were "unnecessary" or unsupported by a "legitimate reason"). See, e.g., *Ewald v Ewald*, 292 Mich App 706, 722; 810 NW2d 396 (2011) (concluding debt expense to continue father's farming operation must be deducted from his gross income to determine his "net income" from his farming operation). Indeed, nothing in the MCSF can be read to categorically limit the parent's freedom to make these business decisions or to require the attribution of greater income to a parent who makes relatively conservative business decisions. In short, provided that the operation of a parent's business is in keeping with historical practices, that those practices can be

described as the reasonable exercise of business judgment, and that there is no evidence of an improper effort to make funds unavailable for child support, nothing in the MCSF mandates that the reality of how a parent operates a business, and has historically operated a business, should be dismissed in favor of an alternative method in which the business could be conducted.

Thus, turning to the particular facts of the present case, problematic in Cherfoli's opinion is his substitution of his own judgment for that of plaintiff's in terms of how SGC could be appropriately managed and, as a related matter, Cherfoli's general disregard of the corporation's historical practices. That is, rather than focus on SGC's historical business practices and its historical distribution of profits to plaintiff, which would afford plaintiff continued control in the management of the corporation while at the same time ascertaining what monies should be available for child support under the MCSF, Cherfoli focused on how the business *could* be run by comparing its practices to that of an industry standard and offering his own personal opinion regarding what percentage of profit could be distributed under his alternative model. Central to our decision is the fact that Cherfoli did *not* opine that plaintiff's management of his corporation or his retention of profits in the corporate coffers was outside the range of how business owners could reasonably be expected to conduct their business.[3] Cherfoli did not focus his analysis on whether the profits retained by SGC were used or intended for unnecessary or illegitimate business expenses, whether the retention of funds was at odds with plaintiff's historical practices,[4] or whether plaintiff retained those funds in the corporation in order to avoid child support. Instead, in substituting his own judgment for that of plaintiff's, Cherfoli freely acknowledged that his estimation was his own "personal" opinion, and, beyond his own personal feelings on the subject, he offered no basis to conclude that 60 to 65 percent of "excess working capital" was actually available to plaintiff or *should* be distributed by SGC to plaintiff. See 2013 MCSF 2.01(B), (E)(2). Accordingly, we conclude that the trial court erred by adopting the opinion of an expert who evaluated plaintiff, not based on how plaintiff historically ran the business, but based on, in essence, the substitution of his own business judgment for that of plaintiff's in terms of how much income the business could relinquish.[5]

---

[3] Rather than fault plaintiff for making questionable or unprincipled business decisions, Cherfoli ultimately charged plaintiff with nothing more than the operation of a "conservative" business model insofar as plaintiff preferred to operate debt free as opposed to pursuing loans to finance his operations.

[4] The record in fact suggests that plaintiff historically purchased equipment for cash and, for several years, maintained roughly the same amount of cash on hand in the corporation.

[5] The dissent finds no fault in the trial court's adherence to Cherfoli's opinion because, rather than evaluate a parent's available income based on an S corporation's actual distributions and historical conduct, the dissent proposes the use of a non-exhaustive list of factors described in *JS*, 454 Mass at 662-663. To adopt these judicially created factors would, however, improperly supplant the MCSF, which controls the determination of a parent's "income" for child support purposes in Michigan. Rather than follow the approach outlined in *JS*, we are persuaded that a court evaluating a parent's income—including cases involving income generated by an S

## *ii.* DISTRIBUTIONS FOR PAYMENT OF TAXES

As a related matter, we consider plaintiff's assertion that the trial court erred by including within the calculation of his income funds distributed to plaintiff for payment of taxes arising from SGC's corporation earnings. As noted, when a corporation elects S corporation status, income taxes are paid by the shareholders, rather than the corporation; but, the corporation owns the profits on which the taxes are paid and the corporation is not required to actually distribute this income to the shareholders. See *Ross*, 481 Mich at 9; *In re Marriage of Brand*, 273 Kan at 351. In many cases, however, the corporation may chose to distribute funds to shareholders for the payment of the tax liability arising from the corporation's earnings. See, e.g., *Tebbe*, 815 NE2d at 183.

In such circumstances, it is clear that funds distributed for payment of taxes on earnings retained by the corporation are not an indication of what the parent has, or should have, available for child support. See 2013 MCSF 2.01(B). That is, the MCSF acknowledges the unique taxation rules involved with business ownership, 2012 MCSF 2.01(E)(1)(b), and specifically recognizes that money may be passed on to the parent, not as income, but "as a tax strategy," see 2013 MCSF 2.01(C)(2)(a). The election of S Corporation status is plainly one such "tax strategy" and, given the manner in which an S corporation functions, it is readily apparent that funds distributed under this model for payment of taxes arising from earnings retained by the corporation are not "available" to the parent for the payment of child support. See 2013 MCSF 2.01(E)(2). Instead, they are a necessary business expense, properly excluded from the parent's net income. See, e.g., *Ewald*, 292 Mich App at 722. See also 2013 MCSF 2.07(B) (including actual taxes paid as items to be deducted from a parent's income under the MCSF). Consequently, while money passed as a tax strategy must be carefully examined to ensure it is, in truth, a tax strategy, see 2013 MCSF 2.01(C)(2)(a), we hold that funds distributed by an S Corporation to shareholders to actually offset payment of taxes on earnings retained by the corporation should not be included as income to the shareholder-parent under the MCSF.[6]

In this case, Cherfoli conceded in his testimony that some of the funds identified by plaintiff as funds used for the payment of taxes were included within his calculations of income, and the FOC referee determined that such funds were properly included as income. The trial court did not, however, expressly address the matter. Consequently, on remand, the trial court shall, when assessing plaintiff's income, determine what corporate distributions to plaintiff, if any, were used by plaintiff to pay taxes on corporate earnings retained by SGC. Any such

---

corporation—is presumptively required to apply the relevant provisions of the MCSF to the facts of the case. See *Stallworth*, 275 Mich App at 284.

[6] Our holding in this regard is consistent with that of other jurisdictions to have recognized that distributions from an S Corporation to offset a shareholder's tax liability should not be considered income to the parent because such funds do not actually increase the shareholder's ability to pay child support. See, e.g., *In re Marriage of Matthews*, 40 Kan App 2d 422, 431; 193 P3d 466 (2008); *Walker v Grow*, 170 Md App 255, 280; 907 A2d 255 (2006); *Tebbe*, 815 NE2d at 184; *McHugh v McHugh*, 702 So 2d 639, 642 (Fla Dist Ct App 1997).

distributions, used merely to offset plaintiff's tax liability attributable to SGC, shall not be included in the determination of plaintiff's income.

## III.  CUSTODY

On appeal, plaintiff also challenges the trial court's custody and parenting time determinations.  In particular, plaintiff argues that the trial court erred by ostensibly awarded joint custody, but then only providing plaintiff with parenting time comparable to that of a non-custodial parent.  Plaintiff maintains that 122 days parenting time is insufficient to allow him to foster a relationship with the children, and he asserts that this case "cries out for true joint custody."  He also expresses concern that defendant, who is not a United States citizen, may remove the children to the Philippines.  In plaintiff's view, the trial court also should not have relied on defendant's testimony when deciding the issue of custody because she was not a credible witness.  Apart from these more general criticisms of the trial court's rulings, plaintiff challenges the trial court's findings regarding several best interests factors, specifically, factors (b), (d), (f), (h), and (*l*).

On appeal, pursuant to MCL 722.28, in child custody disputes, "all orders and judgments of the circuit court shall be affirmed . . . unless the trial judge made findings of fact against the great weight of the evidence or committed a palpable abuse of discretion or a clear legal error on a major issue."  *Dailey v Kloenhamer*, 291 Mich App 660, 664; 811 NW2d 501 (2011).  Thus, we review the trial court's findings of fact, including its findings related to the best interest factors, under the great weight of the evidence standard.  *Fletcher v Fletcher*, 447 Mich 871, 877-879; 526 NW2d 889 (1994).  Discretionary rulings, including the ultimate award of custody and the award of parenting time, are reviewed for an abuse of discretion.  *Id.* at 879; *Shade v Wright*, 291 Mich App 17, 20; 805 NW2d 1 (2010).  An abuse of discretion occurs "only in extreme cases in which the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will or the exercise of passion or bias."  *Brown v Loveman*, 260 Mich App 576, 600-601; 680 NW2d 432 (2004).  In comparison, "clear legal error" occurs when the trial court chooses, interprets, or applies the law incorrectly.  *Fletcher*, 447 Mich at 881.

Plaintiff primarily argues on appeal that the trial court abused its discretion by failing to award the parents equal parenting time.[7]  In awarding parenting time, it is the best interests of the children that control the determination of a parenting time schedule.  *Berger v Berger*, 277 Mich App 700, 716; 747 NW2d 336 (2008).  See also *Harvey v Harvey*, 470 Mich 186, 187 n 2; 680

---

[7] Early in the litigation, plaintiff sought sole physical and legal custody of the children.  However, at the time the trial court made the final custody determination in this case, plaintiff sought and received joint custody.  On appeal, he similarly claims that joint custody was appropriate.  At points, however, plaintiff asserts that the trial court should have granted him sole custody.  This unpreserved claim lacks merit given that plaintiff concedes that an established custodial environment exists with both parents and he did not present clear and convincing evidence that a change in custody was in the best interests of the children.  MCL 722.27(1)(c); *Thompson v Thompson*, 261 Mich App 353, 362; 683 NW2d 250 (2004).  Consequently, we discern no abuse of discretion in the trial court's award of joint custody.

NW2d 835, 837 (2004) ("[T]he statutory 'best interests' factors control whenever a court enters an order affecting child custody."). "Both the statutory best interest factors in the Child Custody Act, MCL 722.23, and the factors listed in the parenting time statute, MCL 722.27a(6), are relevant to parenting time decisions." *Shade*, 291 Mich App at 31. While custody decisions require findings under all the best interest factors, where parenting time is at issue, the trial court need only make findings on contested issues. *Id.* at 31-32.

To the extent plaintiff challenges the trial court's award of parenting time as a deviation of what it means to have "joint custody," he is mistaken in his understanding of "joint custody." Joint custody does not necessitate a 50/50 split of the children's time between each parent. Rather, pursuant to MCL 722.26a(7)(a), "joint custody," in terms of physical custody, is defined as an order of the court in which it is specified that "the child shall reside alternately for specific periods with each of the parents." No specific schedule is required; instead, the focus is on the best interest of the children, and parenting time must be granted "in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time." MCL 722.27a. The Michigan Parenting Time Guideline recognizes that there are myriad parenting time arrangements available depending on what will serve the bests interests of the children. See Friend of the Court Bureau, Mich. Supreme Court, *Michigan Parenting Time Guideline* (Lansing: State Court Admin. Office), p. 7-9, 12.

In this case, the parenting schedule, pursuant to which the children reside alternatively for specific periods with each of the parents, plainly constituted an award of joint custody of the type contemplated by our Legislature. See MCL 722.26a(7)(a). Contrary to plaintiff's arguments, the schedule—which afforded him 122 days, or roughly a third of each year—provided ample time for him to "promote a strong relationship" with his children, see MCL 722.27a, and it was in fact not a significant deviation from the 140 days parenting time to which he had previously agreed, cf. *Shade*, 291 Mich App at 32. The schedule affords defendant the bulk of the school year and plaintiff time when the children are not in school, a schedule which was not an abuse of discretion given evidence that defendant has historically been responsible for the children's day-to-day care and educational needs, while plaintiff's Holly home is a 45-minute drive from the children's school. In short, the trial court was not required to provide a perfect division of parenting time, and the trial court did not abuse its discretion in adopting the schedule at issue.

Insofar as plaintiff specifically challenges the trial court's assessment of the children's best interests as described in the best interest factors, MCL 722.23, he has not shown the trial court's findings were against the great weight of the evidence. First, to the extent plaintiff challenges the trial court's consideration of factor (b), this factor involves the capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any. MCL 722.23(b). The trial court determined that this factor favored defendant because she was the children's stay-at-home caretaker, and in this role she was responsible for the children's daily care, medical decisions, discipline in the form of "time outs", and school related matters such as attendance at

parent-teacher conferences. These findings were supported by defendant's testimony[8] regarding her role with the children, testimony from an FOC investigator who interviewed the parties, and by testimony from defendant's adult daughter from another relationship who lived with the family when the children were younger. While plaintiff argues on appeal that he has been long-involved in the children's upbringing and more "proactive" than defendant in the children's development, such arguments are merely an attack on the trial court's credibility determinations and not an indication that the trial court's findings were against the great weight of the evidence. *Berger*, 277 Mich App at 711. On the whole, the trial court's conclusion that factor (b) favored defendant was supported by the evidence.

Regarding factor (d), "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity," the trial courts findings were similarly not against the great weight of the evidence. The trial court concluded that this factor was neutral because both parties shared joint physical custody and there existed a shared custodial environment—facts which plaintiff concedes on appeal. Contrary to plaintiff's contention that defendant disturbed the continuity of the children's environment by removing the children from the Shelby home in contravention of a court order, the trial court found no evidence or testimony to support this assertion, and nothing in the record establishes that the trial court's determinations regarding factor (d) were against the great weight of the evidence.

The trial court also reasonably concluded that factor (f), the moral fitness of the parties involved, was a neutral factor based on evidence to suggest that both parents had moral failings which, in essence, offset the other. Although plaintiff contests on appeal whether he abuses alcohol, and whether this may be equated with defendant's gambling and financial wrongdoings, we cannot see that the trial court's findings were against the great weight of the evidence. To the extent plaintiff casts additional slurs on defendant's character, those issues were presented to the trial court and the trial court was not required to specifically comment on every piece of evidence or argument.[9] *McIntosh*, 282 Mich App at 474-475. Given the evidence demonstrating that both parties have moral failings, the trial court's finding that factor (f) was neutral was not against the great weight of the evidence.

---

[8] In general, plaintiff urges this Court to disregard many of the trial court's findings of fact because they relied on defendant's testimony, which plaintiff describes as not credible. However, plaintiff's attacks on defendant's credibility ignore the deference due to the trial court in making such determinations, and such arguments do not demonstrate that the trial court's finding were against the great weight of the evidence. See *Berger*, 277 Mich App at 708, 711.

[9] One of plaintiff's specific accusations raised in relation to defendant's character is that she may take the children to the Philippines as she did her children from a previous relationship. These fears appear unfounded as there is no indication that defendant has any interest in returning to the Philippines with the children or that she has threatened to do so without plaintiff's permission. See MCL 722.27a(6)(h). In any event, contrary to plaintiff's representations on appeal, the trial court addressed plaintiff's concerns, specifically ordering that neither party shall take the children to a country which is not a party to the Hague Convention on the Civil Aspects of International Child Abduction without signed consent from the other party.

Relating to factor (h), the home, school, and community record of the child, the trial court reasonably concluded that this factor favored defendant given that she has the primary responsibility for the children's education. While plaintiff disagrees with this assertion on appeal and endeavors to establish he was "proactive" in the children's development, by his own admissions in the trial court he was not as "active" in the children's preschool and he did not frequently attend parent-teacher conferences. On the evidence presented, the trial court's finding that factor (h) weighed in defendant's favor was not against the great weight of the evidence.

Under factor (*l*), which involves "any other factor considered by the court to be relevant to a particular child custody dispute," the trial court considered plaintiff's attempts to financially manipulate defendant over the course of the proceedings. Specifically, defendant testified that plaintiff forced her out of the Shelby home on multiple occasions, and plaintiff's father testified that plaintiff took defendant's credit cards and stopped paying her when she was an SGC employee. Plaintiff's treatment of defendant was a relevant factor for the trial court to consider when evaluating the children's best interests, and, on the record presented, the court's findings relating to factor (*l*) were not against the great weight of the evidence.

On the whole, after reviewing the record, we find the trial court's findings were not against the great weight of the evidence, the court did not commit clear legal error on a major issue, and the trial court did not abuse its discretion in awarding joint custody and adopting a parenting schedule affording plaintiff 122 overnights per year. Consequently, we affirm the trial court's custody and parenting time determinations. See MCL 722.28.

## IV. ATTORNEY FEES

Lastly, plaintiff also challenges the trial court's award of attorney fees to defendant. Specifically, plaintiff argues that defendant can afford to pay her fees, in large part because plaintiff's father has paid defendant's legal fees and that such payment was, contrary to defendant's representations to the trial court, not a loan. Further, plaintiff challenges his own ability to pay the fees and contests the necessity of some of the fees, arguing that defendant's counsel conducted "unnecessary, improper duplications of discussions" with defendant and plaintiff's father and stepmother.

As noted, the trial court awarded defendant $118,000 in fees, finding she was unable to pay these expenses while plaintiff could afford the cost of her attorney fees. On appeal, we review a trial court's decision whether to award attorney fees for an abuse of discretion. *Loutts v Loutts*, 298 Mich App 21, 24; 826 NW2d 152 (2012). We review the trial court's findings of fact for clear error, and any questions of law de novo. *Id.*

Requests for attorney fees in child custody disputes are governed by MCR 3.206. Pursuant to MCR 3.206(C)(1), "A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding." A party who requests attorney fees and expenses must allege facts sufficient to show that:

> (a) the party is unable to bear the expense of the action, and that the other party is able to pay, or

-14-

(b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply. [MCR 3.206(C)(2).]

Typically, this rule has been interpreted to require an award of attorney fees to the extent "necessary to enable a party to prosecute or defend a suit." *Myland v Myland*, 290 Mich App 691, 702; 804 NW2d 124 (2010). " '[A] party sufficiently demonstrates an inability to pay attorney fees when that party's yearly income is less than the amount owed in attorney fees.' " *Loutts*, 298 Mich App at 24 (quotation omitted).

In this case, plaintiff argues that defendant did not have an inability to pay her attorney fees. Such an argument has no basis in the evidence given that defendant had an annual income of less than $8,000 per year while she incurred legal fees in excess of $118,000 during the course of the litigation. In such circumstances, the trial court did not clearly err in finding defendant could not afford her attorney fees. See *id.* In comparison, contrary to plaintiff's claim that he cannot afford to meet defendant's attorney fees, the evidence shows that he is the sole shareholder of a profitable corporation. Even if his actual annual income is not as extensive as that calculated by the trial court, plaintiff makes, by his own admission, a salary of upwards of $183,000 per year, he has funds in savings, and he could, as he did to purchase the Holly home, withdraw funds from SGC. On the facts of this case, the trial court did not abuse its discretion in awarding defendant attorney fees pursuant to MCR 3.206.

Nevertheless, on appeal, despite defendant's low salary in comparison to her extensive bills, plaintiff maintains that defendant could pay her fees because plaintiff's father had provided her the money. Contrary to plaintiff's arguments, the evidence presented shows that defendant had agreed to repay plaintiff's father for those fees he paid on her behalf. If anything, the fact that defendant had to borrow money to pay her fees only underscores her inability to pay the expenses, further justifying an award under MCR 3.206(C)(2)(a). Lastly, insofar as plaintiff challenges the necessity of some of the expenses, there is no evidence to support his allegations regarding the duplicative nature of the conversations he challenges, and we see nothing improper in defendant's attorney meeting with plaintiff's father and stepmother, both of whom lived with defendant and were relevant witnesses, or potential witnesses, in this child custody dispute. Plaintiff has not shown the trial court's award of attorney fees was an abuse of discretion.

## V. CONCLUSION

In sum, the trial court did not abuse its discretion, either in awarding custody and parenting time, or in awarding defendant attorney fees pursuant to MCR 3.206. However, the trial court's calculation of plaintiff's income was an error of law insofar as it focused on an expert's business judgment of how SGC could be run, rather than the historical practices of the business and plaintiff's efforts, if any, to shield income in the corporation. We hold also that funds, if any, which were distributed to plaintiff for the payment of SGC's taxes should not have been used in the calculation of his income. Consequently, we vacate the trial court's award of child support and remand for a recalculation of plaintiff's income.

Affirmed in part, vacated in part, and remanded for reconsideration of plaintiff's income for purposes of child support under the MCSF consistent with this opinion. We do not retain jurisdiction. No costs, as neither party prevailed in full. MCR 7.219.


/s/ Joel P. Hoekstra
/s/ Kurtis T. Wilder