# STATE OF MICHIGAN

# COURT OF APPEALS

---

JANINE MARIE EXLINE,

        Plaintiff-Appellant,

v

JASON MICHAEL SILVER,

        Defendant-Appellee.

UNPUBLISHED
October 13, 2016

No. 327797
Oakland Circuit Court
Family Division
LC No. 2004-692277-DM

---

Before: FORT HOOD, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

Several years after the parties to this case divorced, the defendant-father sought a reduction of his child support obligation. The trial court accepted evidence that the father's income had dramatically decreased and significantly reduced the child support award. The plaintiff-mother appeals. Although we find no issue with certain of the court's findings, others were made in error. Accordingly, we affirm in part but remand for further consideration.

## I. BACKGROUND

Janine Exline and Jason Silver divorced in 2004. During the marriage, they had three children, the youngest two of whom are still minors. The 2004 divorce judgment named Exline as the children's primary custodian, set a specific parenting time schedule, and awarded $3,200 each month in child support. In 2012, Silver agreed to increase his monthly payments to $3,600.

In 2013, Silver filed circuit court motions to increase his parenting time and decrease his child support obligation. In relation to his motion to decrease child support, Silver contended, "Due to a significant down turn in the Defendant's business, his income has been dramatically decreased . . . ." Silver owns and operates Silver's Jewelry & Loan (SJL), formerly Lou Silver Diamond Broker, which he took over in 2010 after the death of his father. On September 11, 2013, Fifth Third Bank notified Silver that his company was in default on a loan and called in the note. Silver was required to repay more than $637,000.[1] Silver admits that before October 2013,

---

[1] Silver asserted that Fifth Third merely called in the loan because it no longer desired to work with predominantly cash businesses. An October 10, 2013 letter from Fifth Third's counsel,

he earned between $300,000 and $500,000 annually, not including perks paid for by his company.

Following the Fifth Third loan recall, Silver searched for financing elsewhere. He contends that he located Great Lakes Business Credit, L.L.C. (GLBC) through a bankruptcy attorney. GLBC extended a line of credit and the loan agreement included a "salary limitations" provision, stating "Borrower shall not allow the annual total of all salaries, bonuses, fringe benefits, and all other compensation paid by Borrower to Jason M. Silver to exceed the sum of $110,000." This salary decrease was necessary to save his business, Silver contended, and supported the reduction of his child support obligation.

Exline objected to any reduction in child support. She challenged Silver's unsupported assertion that his business had experienced a downturn. She also questioned Silver's claim to poverty given the lavish lifestyle he continued to lead. In this regard, Exline posited that Silver lived in a $1.2 million home on Orchard Lake and owned a rental house in Novi, owned two boats and multiple high-end vehicles, purchased suites and season tickets for all the major Detroit sports teams, and took several expensive vacations every year. Of particular concern to Exline was Silver's claim that he could not continue his level of support for his own children when he paid tuition for his stepdaughter at Cranbrook.

During the discovery process, Exline learned that Silver sold his Orchard Lake home for $1.55 million, an alleged $600,000 gain. He then bought a spacious home for $575,000 in the Palmer Park district of Detroit. With this move, Silver purchased annual memberships to the Detroit Athletic Club and Detroit Golf Club. Exline emphasized Silver's dishonesty throughout this move, asserting that Silver claimed he would move into his Novi property, which had been vacated by the tenant.

Exline questioned Silver's transfer of business income to relatives who were not employed by the business. Specifically, SJL regularly transferred money to Silver's second wife, his mother, and sister. Silver claimed he only paid his wife so she could establish employment to secure their new mortgage. His mother, Silver claimed, was entitled to $214,000 annually pursuant to a severance agreement executed when he took over the family business in 2010. Maintaining health insurance for his sister under the company policy was part of that deal.

Another issue of hot debate was $380,000 secured by Silver from GLBC to purchase the Detroit home. Silver ultimately secured a mortgage to buy the Detroit home instead. Silver kept the $380,000 with the remainder of his GLBC loan in the business accounts. He then used the proceeds of this Orchard Lake home sale to repay $380,000 to GLBC. As Silver used his personal property (the proceeds from his home sale) instead of the borrowed $380,000 to repay that portion of the loan, he contended that the business owed him $380,000. Therefore, Silver claimed entitlement to use business funds to pay personal obligations without counting that

---

however, indicated that Silver's company defaulted on the loan by failing to make its October 2013 payment and by "submitting financial statements of [SJL] for December 31, 2012 and March 31, 2013 knowing that they contained misleading and materially inaccurate inventory figures."

amount as income. Exline challenged Silver's excessive use of his business to pay personal liabilities, but he claimed they all fit within this $380,000.[2]

After hearing two days of testimony and accepting multitudinous financial records from the parties, the court entered an opinion and order on December 11, 2014. The court credited Silver's testimony that the $380,000 held by SJL was not his income, but was actually the proceeds from the sale of his Orchard Lake home. Although such gains can be considered income, the court declined to do so in this case because it did not count the $85,000 profit from the sale of Exline's Farmington home as part of her income.

The court declined to consider the payments from SJL to Silver's current wife and sister as income imputed to him. The court implied that the payments to Mrs. Silver were withdrawn from the $380,000 sale proceeds and noted that Silver had ceased payments to his sister and on his sister's behalf. The court further determined that Silver's annual payments to his mother should not be included in his income; these payments reimbursed Silver's mother for her share of the business that she transferred to her son.

The court acknowledged that Silver owned a home in Novi for investment purposes and generated an income of $800 each month from January to September 2014. The court accepted Silver's testimony, however, that his tenant had vacated the property and was no longer paying rent. Accordingly, the court declined to count the rent as part of Silver's income.

Ultimately, the court ruled:

> The court acknowledges that Defendant Father's income was previously substantially higher than it is currently and that the records reflect an equally lavish and expensive lifestyle. The court also acknowledges that Defendant Father's expenditures from the balance of his $380,000 loan to the company— payments for suites at entertainment venues, a golf club membership, and his stepdaughter's pricey private school education—have been quite irresponsible and have not benefitted his own children. However, Defendant Father is no longer in control of his own income and it is not foreseeable that his income will continue to fluctuate dramatically. Just as Defendant Father testified, his life and spending habits will need to change dramatically. The court finds that it is not proper to average Defendant Father's income for the past three years for child support purposes pursuant to [Michigan Child Support Formula (MCSF)] 2.02(C). The court finds that Defendant Father's income for child support purposes is $110,000.00 annually.

---

[2] With a motion filed after the order on appeal in this case, Exline presented an accounting that revealed that SJL paid $554,986.03 in 2013 and $938,380.08 in 2014 for Silver's personal expenses. On remand, the circuit court must consider this evidence and determine whether these amounts, which far exceed $380,000, should be counted as income.

Based on this income level and the Friend of the Court (FOC) calculations, the court ordered Silver to pay child support in the amount of $913.97 monthly for three children, $601.23 for two, and $186.40 for one.

Exline filed an unsuccessful motion for reconsideration in the circuit court. It appears that she initially was resigned to her financial fate. According to several pleadings in the lower court record, Silver stopped paying for the children's school and extracurricular activities as required by the divorce judgment, fell behind in his child support payments, and played fast and loose with the parenting time order, as well as denying his children the right to participate in extracurricular activities during his parenting time. Only then did Exline file her delayed application for leave to appeal, which this Court granted. *Exline v Silver*, unpublished order of the Court of Appeals, entered December 10, 2015 (Docket No 327797).

## II. ANALYSIS

On appeal, Exline argues that the trial court erred in calculating Silver's income for child support purposes. " 'A trial court must presumptively follow the MCSF when determining the child support obligation of parents,' " and " '[t]his Court reviews de novo as a question of law whether the trial court has properly applied the MCSF.' " *Teran v Rittley*, 313 Mich App 197; 882 NW2d 181 (2015), quoting *Ewald v Ewald*, 292 Mich App 706, 714; 810 NW2d 396 (2011). We review the trial court's factual findings for clear error and discretionary rulings for an abuse of discretion. *Id*. "A finding is clearly erroneous if [this Court is] left with a definite and firm conviction that a mistake has been made," *Cunningham v Cunningham*, 289 Mich App 195, 200; 795 NW2d 826 (2010), and "[t]he trial court abuses its discretion when it 'selects an outcome that is outside the range of reasonable and principled outcomes.' " *Teran*, 313 Mich App at 197, quoting *Ewald*, 292 Mich App at 714.

Parents have a duty to support their minor children, MCL 722.3, and a trial court must strictly comply with the requirements of the MCSF in calculating the parents' support obligations unless it "determines from the facts of the case that application of the child support formula would be unjust or inappropriate . . . ," MCL 552.605(2). "A trial court has the statutory power to modify child support orders upon a showing by the petitioning party of a change in circumstances justifying modification." *Sayre v Sayre*, 129 Mich App 249, 251-252; 341 NW2d 491 (1983). In modifying a support agreement, the trial court considers "all relevant factors," including the child's needs and the parents' ability to pay support. *Id*.

The first step in making any child support determination "is to ascertain each parent's net income by considering all sources of income." *Stallworth v Stallworth*, 275 Mich App 282, 284; 738 NW2d 264 (2007). This is generally accomplished "by ascertaining 'the actual resources of each parent.' " *Id*., quoting MCL 552.519(3)(a)(*vi*). "The objective of determining net income is to establish, as accurately as possible, how much money a parent should have available for support." 2013 MCSF 2.01(B). Further, the MCSF indicates that "[a]ll relevant aspects of a parent's financial status are open for consideration when determining support," 2013 MCSF 2.01(B), and a parent's income calculated using the MCSF "will not be the same as that person's take home pay, net taxable income, or similar terms that describe income for other purposes," 2013 MCSF 2.01(A).

## A. RENTAL INCOME

As noted, the trial court declined to consider the nine months of rent payments collected by Silver from his Novi property as income. This was clear error. The MCSF broadly defines "income" to include "[e]arnings generated . . . from rentals." 2013 MCSF 2.01(C)(2). See *Borowsky v Borowsky*, 273 Mich App 666, 675; 733 NW2d 71 (2007) (finding the defendant's rental income "constitute[d] income for purposes of the child support formula"). Testimony established that Silver earned approximately $800 monthly profit on his Novi rental property through September 2014. The tenant's holdover and failure to pay rent beyond September was not cause to exclude this income source completely. As Silver's child support was modified effective October 1, 2013, these profits earned in 2014 should have been considered income. To remedy this error, the trial court must reconsider Silver's 2014 income on remand.

However, Silver has since sold the property and therefore will no longer earn income from this source. Accordingly, going forward, rent will not be an income source to include in child support calculations. But the proceeds from the sale of the rental property may.

Although the MCSF does not directly address profits from the sale of property, 2013 MCSF 2.01(C)(9) defines income to include "[a]ny money or income due or owed by another individual, source of income, government or other legal entity." 2013 MCSF 2.01(C)(9); see also MCL 552.602(n)(*iii*) (income includes "[a]n amount of money that is due to an individual as a debt of another individual . . . ."). "Thus, *gains* from the sale of property fall within the broad definition of 'income' provided in" the MCSF. *Borowsky*, 273 Mich App at 680 (emphasis added) (holding that language identical to that found in 2013 MCSF 2.01(C)(9) included gains from the sale of property). A one-time sale may create a "distorted impression" of a party's income, however. *Borowsky*, 273 Mich App at 681 n 8. In any event, on remand, the trial court must consider the profit from the sale of Silver's Novi rental property and determine the propriety of including those proceeds as income.

## B. PAYMENTS TO CHERYL SILVER

Exline also challenges the trial court's refusal to include in Silver's income the $214,000 annual payments made to Silver's mother, Cheryl Silver, by SJL. The MCSF recognizes that it can be "difficult[] . . . determining the income for self-employed individuals." 2013 MCSF 2.01(E)(1). To assist the courts, the MCSF identifies categories of compensation that the trial court should "[p]ay special attention to." 2013 MCSF 2.01(E)(4). Pertinent to this challenge, 2013 MCSF 2.01(E)(4)(c) provides:

> Redirected income, or amounts treated by the business or company as if the redirected amounts were something other than the parent's income. Amounts include, but are not limited to:
>
> * * *
>
> (*ii*) Payments made to friends or relatives of the parent. If the business cannot demonstrate that the payments are equivalent to a fair market value payment for the work or services the friend or relative actually performs, include any amount that exceeds the fair market value as the parent's income.

SJL has paid Cheryl $214,000 annually since 2011 and is required to continue these annual payments for ten years. Silver cannot claim that these payments represent a fair market value for work presently performed by Cheryl; Cheryl no longer works for the company. However, Silver, as well as his company's attorney and accountant, provided reasonable explanations for this payment arrangement. First, when Lou Silver died, Cheryl transferred the 80% share of the company she and her husband owned to her son. This was a gift but it came with strings. In exchange for the shares, Silver was required to care for his mother financially. As Cheryl had worked for the company for several decades, this financial arrangement was categorized as a severance agreement. Second, Lou and Cheryl had placed personal assets into the company to ensure its success. This included a $1,000,000 cash infusion. The $214,000 annual payments to Cheryl also recognized the need to repay this debt.

The trial court credited this testimony and declined to count these amounts in Silver's income. 2013 MCSF 1.01(B) generally requires trial courts to "order child support in the amount determined by applying this formula." The formula permits a court to deviate as provided in MCL 552.605.[3] 2013 MCSF 1.01(B) also provides, "Unless rebutted by facts in a specific case, the law presumes that this formula . . . sets appropriate levels of support." Similarly, 2013 MCSF 1.04(A) states, "When applying the formula would lead to an unjust or inappropriate result, the court may exercise its discretion, and, on a case-by-case basis, deviate from the formula and determine a more appropriate support amount." Here, the court deviated from a single instruction in the formula for calculating a party's income. The court determined that even though Cheryl was not currently working for the sums she received from SJL, these payments were a legitimate company expense that should not be imputed to Silver. We discern no abuse of discretion or erroneous factual conclusion underlying the court's decision.

---

[3] MCL 552.605(2) provides, in relevant part:

> The court may enter an order that deviates from the formula if the court determines from the facts of the case that application of the child support formula would be unjust or inappropriate and sets forth in writing or on the record all of the following:
>
> (a) The child support amount determined by application of the child support formula.
>
> (b) How the child support order deviates from the child support formula.
>
> (c) The value of property or other support awarded instead of the payment of child support, if applicable.
>
> (d) The reasons why application of the child support formula would be unjust or inappropriate in the case.

## C. PAYMENTS TO ELLORY SILVER

Exline also challenges payments made to Silver's second wife, which were counted as salary in SJL's books. Ellory never worked for SJL nor had she loaned the company money. Rather, Silver directed these payments to Ellory for his personal benefit—to create an income stream to Ellory so she could secure a mortgage for the couple's Detroit home. At the hearing, Silver claimed that SJL had recently stopped making these payments to Ellory as they were no longer permitted under the GLBC loan agreement. The court credited this testimony and declined to include these amounts in Silver's income. Documentation presented with post-hearing motions reveals that at least four more payments were made to Ellory after the hearing, impeaching Silver's testimony. On remand, the court must reconsider whether these payments have continued and if so, calculate them as an income source pursuant to 2013 MCSF 2.01(E)(c)(*ii*).[4]

## C. $380,000

Exline challenges the trial court's determination that SJL owed $380,000 to Silver and that he was therefore permitted to withdraw up to $380,000 from the company's funds without counting it as income. Exline contends that "there [were] actually two sets of $380,000 at issue." First and foremost, we reject that proposition. Silver presented evidence and sufficiently explained the trail of these funds and established that SJL retained $380,000 that Silver had used personal funds to repay.[5]

Underlying this issue, however, is a deeper problem. The trial court declined to impute as income several liabilities paid by SJL on Silver's behalf, finding that these funds flowed from the $380,000 loan. These included cellular phone bills, automobile expenses, sports tickets, credit card bills, legal fees, and private school tuition paid on Silver's behalf through SJL. 2013 MCSF 2.01(D) includes as income "the market value of perquisites (perks) received as goods, services, or other noncash benefit for which the parent did not pay, if they reduce personal expenses, and have significant value or are received regularly." 2013 MCSF 2.01(D)(1) provides a nonexclusive list of examples of perks that should be counted as income: "housing, meals, or room and board, personal use of a company business vehicle or mileage reimbursement[.]" 2013 MCSF 2.01(E)(b) further provides in relation to business owners that "gifts, free admission to entertainment, or personal use of business property" should be considered income.

Had Silver limited his use of company funds for his personal use to $380,000, we would find no fault in the trial court's resolution of this issue. However, Exline has presented evidence

---

[4] There is no record indication that JSL continued to pay a salary to and health benefits for Silver's sister. Accordingly, we discern no reason to overturn the trial court's decision not to include these amounts in Silver's income.

[5] Although the $380,000 may be characterized as gains following a home sale, which can be imputed as income pursuant to 2013 MCSF 2.01(C)(9), the court decided to even the playing field and exclude the gains of both parties from the sales of their primary residences.

that Silver may have used over $900,000 of SJL's funds for his personal use in 2014 alone, and more than $500,000 in 2013. On remand, the trial court must carefully consider the parties' evidence of Silver's spending habits to ascertain whether Silver used his control over SJL "to arrange compensation to reduce the amount visible to others looking for common forms of income," 2013 MCSF 2.01(E)(1)(c), and calculate Silver's true income accordingly.

## D. HISTORICAL VERSUS ANTICIPATED EARNING APPROACH

Finally, Exline challenges the trial court's decision to calculate only Silver's income from 2014 after accepting Silver's testimony that his income had been drastically reduced by his agreement with GLBC to save his company. Generally, "[w]here income varies considerably year-to-year due to the nature of the parent's work," as in this case, courts must "use three years' information to determine that parent's income." 2013 MCSF 2.02(B). And in relation to parents who own their own business, the trial court must carefully examine "whether unnecessary reductions in salaries, fees, or distributed profits have occurred by comparing amounts and rates to historical patterns." 2013 MCSF 2.01(E)(4)(d). "Unless the business can demonstrate legitimate reasons for a substantial reduction in the percentage of [the parent's] distributed profits" or salary, the court should "use a three-year average to determine the amount to include as a parent's income." 2013 MCSF 2.01(E)(4)(d)(*i*) and (*ii*).

We discern no error in the trial court's decision not to average Silver's income over a three-year period. Silver presented the GLBC loan agreement capping his annual income, perks and fringe benefits at $110,000. This limitation will be in place for the remainder of the children's minorities.

Exline argues that the court should have imputed a higher income or used the three-year average method because Silver was forced to refinance when Fifth Third Bank accelerated its loan after SJL inflated its inventory by approximately $1,000,000, suggesting some kind of fraud. Silver testified, and the trial court apparently accepted, that his struggles with Fifth Third began many months before the default letter stating this reason for ending the loan relationship. Silver testified that the banking industry no longer desires to work with pawn shops and other similar businesses for various reasons. As a result, Fifth Third Bank reorganized SJL's loan and increased his monthly payments from $9,000 to $64,000 in the spring of 2013. When SJL could not keep pace with this new schedule, Fifth-Third found additional reasons to hold it in default.

Silver testified that he could not find another bank to refinance the Fifth Third indebtedness. He consulted with a bankruptcy attorney who recommended GLBC. As a lender that deals with companies in financial distress, GLBC placed many conditions on its loan. In addition to Silver's salary cap, GLBC officers examine SJL's records on a monthly basis.

Based on this evidence, the trial court could determine that Silver did not reduce compensation "to hide income." 2013 MCSF 2.01(E)(d). He was forced to reduce his income from approximately $400,000 to $110,000 annually. We "must defer to the special ability of the trial court to judge the credibility of witnesses," *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014), and therefore find no error in the trial court's decision to focus on Silver's anticipated 2014 income rather than employing a "historical approach."

Moreover, we note "while the MCSF ultimately seeks to discover what monies a parent 'has available' and *should* have available as income, 2013 MCSF 2.01(B) and (E)(2), it does not mandate the pursuit of one reasonable business model over another." *Diez v Davey*, 307 Mich App 366, 383; 861 NW2d 323 (2014). "[A]s a general proposition, the management of a corporation, or any business, obviously involves some exercise of business judgment, and there is no indication in the MCSF that its drafters intended to interfere with this business judgment." *Id.* (citation omitted). As such, we discern no ground to impute income based on Silver's alleged lack of business acumen.

In summation, the trial court erred in failing to consider Silver's rental profits and payments made to Ellory Silver in calculating his income for 2014. Moreover, additional evidence has come to light impeaching Silver's testimony at the fall 2014 trial. Accordingly, on remand, the trial court is directed to reconsider Silver's income in 2014, and up to the present, and modify Silver's child support obligation accordingly.

We affirm in part but remand for recalculation of child support under the MCSF and consistent with this opinion. We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien