# STATE OF MICHIGAN

# COURT OF APPEALS

---

MATTHEW JAMES KRIEG,

      Plaintiff-Appellant,

v

KATHERINE ANN KRIEG,

      Defendant-Appellee.

UNPUBLISHED
June 7, 2018

No. 341055
Gratiot Circuit Court
LC No. 2016-003404-DM

---

Before: O'CONNELL, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

Following a four-day bench trial, the trial court entered a judgment of divorce granting the parties joint legal custody and granting defendant, Katherine Krieg (Katie), primary physical custody of the parties' minor child. The trial court awarded plaintiff, Matthew Krieg (Matthew), one overnight parenting visit per week and one midweek parenting visit. Matthew appeals by right. We affirm.

## I. BACKGROUND

The parties married in July 2014. Katie, who had lived in Saginaw, moved into Matthew's home in Alma. Matthew began an extramarital affair with Rachel Young, an employee at the pizzeria he owns, in October 2015. In December 2015, after Katie and Matthew had discussed starting a family, Katie informed Matthew that she was pregnant. Matthew reacted poorly to this news. Katie later moved back to Saginaw, and Matthew stayed in Alma, where he and Rachel currently live. Matthew filed for divorce in February 2016.

The child was born in August 2016. Matthew began visiting the child at Katie's home a few times a week. In September 2016, the trial court entered a temporary order granting Matthew three four-hour parenting visits per week, which he mostly exercised at his grandparents' home in Bay City. In February 2016, the trial court expanded Matthew's parenting-time visits to eight hours, and he began to bring the child to his home in Alma.

The parties agreed to have Dr. Tracy Allan perform a custody evaluation. Dr. Allan found that Matthew exhibited "solid" parenting skills while Katie showed "exceptional" parenting skills. Dr. Allan recommended that the parties receive equal parenting time on a gradually increasing basis. For example, she testified, Matthew should have one overnight visit within one week and an additional overnight visit within another week, if the first overnight visit

-1-

went well. Molly Minnick, an infant mental health specialist who became involved with the parties early in the child's life, also recommended that Matthew receive overnight visitation, but she recommended a slower transition. Minnick proposed that Matthew have one overnight visit per week for six weeks before adding a second weekly overnight visit, assuming all went well with the first overnight visit. The experts agreed that the child was bonded to both parents. At trial, Matthew sought equal parenting time, while Katie requested primary physical custody and agreed to gradually increasing parenting time for Matthew.

The trial court issued a bench ruling in June 2017, when the child was 10 months old. The trial court first determined that an established custodial environment existed only with Katie. The trial court then found that Matthew's request for equal parenting time would constitute a change in the custodial environment. Reviewing the best-interest factors and relying heavily on Dr. Allan's recommendations, the trial court found that four factors weighed in Katie's favor and the rest favored neither party. The trial court ruled that Matthew failed to establish by clear and convincing evidence that a change in the custodial environment was in the child's best interests. The trial court awarded Katie primary physical custody and Matthew one overnight parenting-time visit and one midweek parenting-time visit per week.

## II. ANALYSIS

### A. PARENTING TIME

Matthew first argues that his parenting-time award constitutes an abuse of discretion. We disagree. A trial court's order resolving a child custody dispute "shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. We review a parenting-time award for an abuse of discretion. *Diez v Davey*, 307 Mich App 366, 389; 861 NW2d 323 (2014). "An abuse of discretion occurs when a court's decision results in an outcome that falls outside the range of reasonable and principled outcomes." *Id.* (quotation marks and citation omitted). "We defer to the trial court's credibility determinations given its superior position to make these judgments." *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

Parenting time under the Child Custody Act of 1970, MCL 722.21 *et seq.*, is governed by MCL 722.27a(1):

> Parenting time shall be granted in accordance with the best interests of the child. It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents. Except as otherwise provided in this section, parenting time shall be granted to a parent in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time.

MCL 722.27a(7) provides various factors that a court may consider in granting parenting time.

Matthew does not challenge the trial court's weighing of these factors. Rather, Matthew maintains that the trial court's order was an abuse of discretion because it unreasonably departed from Dr. Allan's psychological evaluation and her recommendation that the parties receive equal

parenting time.[1]  "While trial courts may consider psychological evaluations, and, at their discretion, afford them the weight they deem appropriate in accord with the Michigan Rules of Evidence, psychological evaluations are not conclusive on any one issue or child custody factor." *McIntosh v McIntosh*, 282 Mich App 471, 475; 768 NW2d 325 (2009).  The trial court plainly considered Dr. Allan's psychological report and evaluation and relied on Dr. Allan's recommendations in evaluating the best-interest factors.  The trial court did not expressly address Dr. Allan's recommendation that the parties share equal parenting time.  However, the trial court determined that Matthew's proposed parenting-time schedule would constitute a change to the established custodial environment and that Matthew failed to prove by clear and convincing evidence that the change was in the child's best interests.  Although Matthew disputes those rulings, the trial court's rulings effectively precluded it from awarding Matthew parenting time that would constitute a change to the custodial environment.

Matthew contends that the trial court should have ordered a gradual increase in parenting time.  He notes that Dr. Allan, Minnick, and even Katie agreed that his parenting time should gradually increase.  The experts' recommendations were not unconditional, however.  Both advocated a "wait-and-see" approach to Matthew receiving more overnight visits, recommending increased overnight visitation only if the child responded well to a first weekly overnight visit with Matthew.  Consistent with the experts' recommendations, the trial court granted Matthew overnight visitation.

Moreover, we cannot fault the trial court for declining to enter a conditional parenting-time award.  Public policy favors the finality of judgments.  *Rose v Rose*, 289 Mich App 45, 58; 795 NW2d 611 (2010).  The divorce proceedings, as they often are, were at times contentious.  A conditional parenting-time award consistent with the experts' recommendations would have likely resulted in additional motions and hearings.  In contrast, the trial court hoped that tensions between the parties would de-escalate once the divorce was finalized.  Although the parenting-time order will be revisited in the future,[2] the order achieved some level of permanency for the foreseeable future.

Matthew relies on a statement in Dr. Allan's psychological evaluation that Katie's preferences for Brayton were "based on [an] outdated understanding of how infants form attachments" and that current research shows that an infant can form attachments to multiple caregivers.  Although Katie apparently told Dr. Allan that she preferred that Brayton have only brief contact with Matthew, Katie made clear at trial that her objection to Matthew receiving equal parenting time was the lack of consistency for the child, rather than a belief that the child could not bond with Matthew.  Indeed, Matthew's proposed parenting-time schedules were not

---

[1] Minnick did not recommend that the parties receive equal parenting time, as Matthew suggests.

[2] The judgment of divorce schedules a review hearing for August 1, 2018, and provides that Matthew will not be required to show proper cause or a change of circumstances to modify the custody order in accordance with MCL 722.27(1)(c).  Katie has not appealed that ruling, so she has presumably waived any objection to the trial court's order.  In any event, this matter has no bearing on whether the trial court's parenting-time award constitutes an abuse of discretion.

consistent weekly schedules. Accordingly, Katie's opposition to Matthew's proposed parenting-time schedule was based on the reasonable belief that transferring the young child back and forth between Saginaw and Alma multiple times a week on a changing schedule was simply not in his best interests.

Moreover, consideration of the parenting-time factors supports the trial court's decision. For instance, one factor is "[t]he inconvenience to, and burdensome impact or effect on, the child of traveling for purposes of parenting time." MCL 722.27a(7)(e). The trial court was cognizant of the distance between Saginaw and Alma, noting that it was "a long car ride for a child at any age." Another factor is "[w]hether the child is a nursing child less than 6 months of age, or less than 1 year of age if the child receives substantial nutrition through nursing." MCL 722.27a(7)(b). The child's primary source of nutrition was from nursing. An additional relevant factor is "[w]hether a parent can reasonably be expected to exercise parenting time in accordance with the court order." MCL 722.27a(7)(f). The trial court was concerned about the amount of hours Matthew would be working. Contrary to Matthew's assertion on appeal, ample evidence supported this concern. Both Katie and Matthew's mother testified that he worked "long hours." Matthew was also in the process of transitioning his pizzeria into a sit-down restaurant with a liquor license. Matthew maintained that his work would not affect his parenting-time hours, but the trial court did not credit this testimony, and we defer to that determination.

In sum, the expert testimony established that overnight visitation between Matthew and the child should begin. The trial court agreed and awarded Matthew one overnight parenting visit per week as well as a four-hour midweek visit. Although the experts also agreed that Matthew's parenting time should gradually increase if Matthew and the child acclimated to the overnight visits, the trial court cannot be faulted for not issuing a conditional parenting-time order that would likely require a series of additional hearings following the divorce proceedings. Considering the child's young age, the distance between the parties, and the concerns regarding Matthew's work schedule, the trial court reasonably concluded that multiple weekly visits to Alma were not in the child's best interests. The experts and the parties agreed that Matthew had formed a parental bond with the child, and the trial court slightly increased Matthew's overall parenting time. Therefore, the trial court's parenting-time award was not an abuse of discretion.

### B. ESTABLISHED CUSTODIAL ENVIRONMENT

Matthew argues that the trial court erred by finding that an established custodial environment existed only with Katie. We disagree. "Whether an established custodial environment exists is a question of fact . . . ." *Hayes v Hayes*, 209 Mich App 385, 387-388; 532 NW2d 190 (1995). We review fact findings in child custody cases using the great weight of the evidence standard. *LaFleche v Ybarra*, 242 Mich App 692, 695; 619 NW2d 738 (2000). A trial court's factual finding is against the great weight of evidence when "the evidence clearly preponderates in the opposite direction." *Id*.

In a child custody dispute,

[t]he court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the

-4-

child. The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. [MCL 722.27(1)(c).]

Stated differently,

[a]n established custodial environment is one of significant duration in which a parent provides care, discipline, love, guidance, and attention that is appropriate to the age and individual needs of the child. It is both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence. [*Berger v Berger*, 277 Mich App 700, 706; 747 NW2d 336 (2008).]

As an initial matter, the trial court may have been operating under the belief that there could be only one established custodial environment when it found that Katie had "*the* established custodial environment." A child may have an established custodial environment with both parents. *Foskett v Foskett*, 247 Mich App 1, 8; 634 NW2d 363 (2001). Nevertheless, the evidence does not clearly preponderate against the trial court's finding that an established custodial environment existed with Katie and its implicit finding that an established custodial environment did *not* exist with Matthew. The child lived exclusively with Katie since birth. Matthew had three four-hour parenting-time visits per week starting in September 2016 and three weekly eight-hour visits beginning in February 2017. Even assuming that the child has looked to Matthew for the necessities of life and parental comfort for an appreciable amount of time, most of Matthew's parenting time was exercised at his grandparents' home in Bay City. After Matthew's parenting-time visits were expanded, he began to bring the child to his home in Alma. By court order, however, Rachel was not allowed to have contact with the child. Dr. Allan also questioned the stability of Matthew and Rachel's relationship. For those reasons, the great weight of the evidence did not establish a secure, stable, and permanent physical and psychological environment between Matthew and the child.

C. BEST-INTEREST DETERMINATION

Matthew argues that the trial court erred in its weighing of several of the best-interest factors. He also argues that the trial court's ultimate disposition of the case was not in the child's best interests. We disagree. Findings of fact regarding the best-interest factors are evaluated under the great weight of the evidence standard. *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994). We review for an abuse of discretion a "trial court's discretionary rulings such as custody decisions." *Phillips v Jordan*, 241 Mich App 17, 20; 614 NW2d 183 (2000).

The trial court may, for the best interests of the child, "[a]ward the custody of the child to 1 or more of the parties involved . . . ." MCL 722.27(1)(a). MCL 722.23 defines the " 'best interests of the child' " as "the sum total of the" factors set forth in MCL 722.23(a) through (*l*). "In child custody cases, the family court must consider all the factors delineated in MCL 722.23 and explicitly state its findings and conclusions with respect to each of them." *Spires v*

*Bergman*, 276 Mich App 432, 443; 741 NW2d 523 (2007). "[T]he trial court has discretion to accord differing weight to the best-interest factors." *Berger*, 277 Mich App at 705.

Matthew argues that the trial court erred by weighing the following best-interest factors in favor of Katie:

> (d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

> (e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

> (f) The moral fitness of the parties involved.

> * * *

> (k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child. [MCL 722.23.]

First, the trial court agreed with Dr. Allan's opinion that factor (d) weighed in Katie's favor. The trial court found that the child was more familiar with Katie and her surroundings but had "limited exposure" to Matthew and his environment. Matthew argues that the trial court erred by relying on Dr. Allan's opinion, which she rendered when the child had just begun home visits with Matthew. He contends that the trial court should have considered that the child had been visiting his home for months by the time of the bench ruling. Setting aside Matthew's failure to make this argument before the trial court, Matthew's increased parenting time since Dr. Allan's recommendation does not clearly preponderate against the evidence supporting the trial court's finding on this factor. Even with a four-hour increase in Matthew's three weekly parenting-time visits, which made visits at his home feasible, the child still had "limited exposure" to Matthew's environment. Conversely, the child lived exclusively with Katie. Matthew also argues that he did not spend more time with the child only because Katie would not allow it. The trial court ordered that the parties could agree to modify the parenting-time schedule, but Katie was not required to grant Matthew additional parenting time. In any event, additional parenting time for Matthew would not change the fact that the child lived exclusively with Katie in what was indisputably a stable and satisfactory environment. Therefore, the court's finding that factor (d) weighed in Katie's favor was not against the great weight of the evidence.

Next, the trial court again agreed with Dr. Allan that factor (e) favored Katie. Dr. Allan questioned the stability of Matthew and Rachel's relationship considering that it began as an extramarital affair and considering the tension between Matthew's mother and Rachel. Matthew argues that Dr. Allan's opinion was based on speculation rather than evidence. However, Dr. Allan, a licensed psychologist, spoke to Matthew's parents, maternal grandparents, and maternal aunt, in addition to speaking with Rachel twice. Matthew's mother told Dr. Allan that she did not want to get to know Rachel, given her role in the affair. At trial, Rachel agreed that Matthew and his family were close, yet she had met only Matthew's father since the relationship began. Further, Matthew and Rachel told Dr. Allan that they intended to marry once the divorce was finalized, but at trial, they still had no concrete plans for marriage. For those reasons, the court's finding that factor (d) weighed in Katie's favor was not against the great weight of the evidence.

Regarding factor (f), the trial court found that the moral fitness of the parents favored Katie. The trial court noted that Matthew was having an affair when the child was conceived and told Katie about the affair after she told him she was pregnant. The trial court characterized Matthew's course of action as "disrespectful" and "dishonest." Matthew argues that his affair, and revealing it during his wife's pregnancy, was not relevant to factor (f). He relies on *Fletcher*, 447 Mich at 887, in which our Supreme Court held that "questionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function *as a parent*." Further, the Supreme Court stated, "[e]xtramarital relations are not necessarily a reliable indicator of how one will function within the parent-child relationship." *Id*.

In this case, additional circumstances regarding Matthew's affair shed light on his ability to function as a parent. In October 2015, around the same time the affair began, Katie discussed with Matthew the idea of resuming birth control instead of trying to conceive, but Matthew adamantly responded that there was no reason for her to go back on birth control. Yet when Katie told Matthew two months later that she was pregnant, he ended their relationship and filed for divorce shortly thereafter. Matthew's behavior all but ensured that his child would be born into a contentious environment. His lack of consideration of how his behavior would affect his child speaks to his ability to function as a parent. The evidence did not clearly preponderate against the trial court's finding regarding this factor.

Lastly, the trial court found that factor (k), domestic violence, weighed in Katie's favor. The trial court noted Matthew's admission that he punched a wall and Katie's testimony that Matthew threatened her, punched walls, and picked fights. The trial court credited Katie's testimony over Matthew's contention that he no longer behaved in this manner. In fact, Matthew admitted to firing a gun into an apartment wall while he was drinking and in Katie's presence. Matthew said that the event occurred in November 2011 and maintained that he no longer consumes alcohol. Matthew also admitted to punching whiteboards and throwing things at the wall at work. Further, Katie said that Matthew threatened to harm her if she ever cheated on him or left him, which Matthew denied. Matthew argues that Katie's testimony was not credible, but we defer to the trial court's determination crediting Katie's testimony on this matter.

Matthew also argues that the "threats" had no connection to his parental fitness, but *Fletcher*'s holding regarding parental fitness was confined to factor (f), *Fletcher*, 447 Mich at 886-888. More broadly, Matthew contends that any behavior predating the birth of the child is presumptively irrelevant to the best-interest factors. Matthew presents no authority for these arguments, so he has abandoned them. See *Riemer v Johnson*, 311 Mich App 632, 653; 876 NW2d 279 (2015). In addition, his failure to identify supporting authority undermines his contention. The trial court's finding that factor (k) weighed in Katie's favor was not against the great weight of the evidence.

For these reasons, the trial court's ultimate ruling that Matthew failed to show by clear and convincing evidence that a change in the custodial environment was in the child's best interests was not against the great weight of the evidence. At trial, Matthew agreed that the child was healthy, happy, and well-adjusted. Matthew argues that a substantial change in parenting time was in the child's best interests because it is important that he and the child continue to develop a bond. Matthew testified that he had "a very close and significant relationship" with

the child under the previous parenting-time order. The trial court then increased Matthew's parenting time by awarding him one overnight visit and one midweek visit. Accordingly, Matthew has identified no reason why he and the child will be unable to keep and strengthen their bond under the new parenting-time schedule.

## D. CONDITIONS ON PARENTING TIME

Matthew argues that the conditions placed on his parenting time were unreasonable. We disagree. We review a parenting-time order de novo, but we "will not reverse the order unless the trial court made findings of fact against the great weight of the evidence, committed a palpable abuse of discretion, or committed a clear legal error." *Brown v Loveman*, 260 Mich App 576, 591-592; 680 NW2d 432 (2004). The trial court may "[p]rovide for reasonable parenting time of the child by the parties involved . . . by general or specific terms and conditions." MCL 722.27(1)(b). MCL 722.27a(9) contains a nonexhaustive list of "reasonable terms or conditions" that a trial court may impose to "facilitate the orderly and meaningful exercise of parenting time by a parent . . . ." MCL 722.27a(9)(*i*) allows the trial court to impose "[a]ny other reasonable condition determined to be appropriate in the particular case."

Matthew argues that the trial court's order that he exercise his four-hour midweek parenting visit in the Saginaw area was unreasonable. Given the distance between Saginaw and Alma, it was not unreasonable for the court to confine Matthew's parenting time to the Saginaw area. If Matthew returned to Alma for his midweek visit, half of that time (if not more) would be spent in a vehicle. Further, Matthew previously exercised his parenting time at his grandparents' home in Bay City, and Katie asserts no objection on appeal to Matthew doing so again. Therefore, the trial court did not abuse its discretion by specifying the Saginaw area as the location of Matthew's midweek visit with the child.

Matthew also contends that the trial court's order that he not possess a handgun while in the child's presence was unreasonable. At trial, Katie and her father raised concerns about Matthew, who has a concealed pistol license, carrying a gun while caring for the child. Their concerns were not unfounded. Matthew previously fired a gun into an apartment wall while intoxicated. Additionally, while Matthew testified that he keeps his guns "locked in a safe" when he is not carrying them, Katie testified that Matthew never locked up the guns but left them "loaded and sitting right beside him all the time." Dr. Allan recommended that Matthew not have a gun on him while holding or interacting with the child, and the trial court expanded that recommendation to preclude Matthew from possessing a firearm while transporting the child. Considering the evidence, the trial court did not abuse its discretion by determining that this restriction was a reasonable condition on Matthew's parenting time.

Finally, Matthew argues that this condition violates his Second Amendment right to bear arms. Matthew did not raise this issue before the trial court, so it is unpreserved. *Elahham v Al-Jabban*, 319 Mich App 112, 119; 899 NW2d 768 (2017). Moreover, Matthew has abandoned this argument by failing to elaborate on it and support it with legal authority. *Riemer*, 311 Mich App at 653. The Second Amendment right to bear arms is not absolute. See *Wade v Univ of Mich*, 320 Mich App 1, 13; 905 NW2d 439 (2017). "On appeal, in order for the appellant to receive relief, [he or she] has the burden to demonstrate that the lower court erred as governed by the relevant standard of review." *Menard, Inc v Escanaba*, 315 Mich App 512, 521 n 3; 891

NW2d 1 (2016). Although Matthew cites the Second Amendment and *McDonald v Chicago*, 561 US 742, 750; 130 S Ct 3020, 177 L Ed 2d 894 (2010) (applying the Second Amendment to the states), he provides no further authority or analysis supporting his position that the condition precluding him from possessing a handgun in the child's presence is unconstitutional. Accordingly, he has failed to show that the trial court committed plain error.

We affirm.

/s/ Peter D. O'Connell
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan