# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

EUGENE H. BOYLE, JR.,

        Plaintiff,

v

CATHERINE METRY BOYLE,

        Defendant/Third-Party
        Plaintiff/Appellee/Cross-Appellant,

and

DAVID SUTHERLAND,

        Third-Party
        Defendant/Appellant/Cross-
        Appellee.

UNPUBLISHED
July 31, 2018

No.   334567
Wayne Circuit Court
LC No.   14-109836-DM

---

EUGENE H. BOYLE, JR.,

        Plaintiff-Appellant,

v

CATHERINE METRY BOYLE,

        Defendant/Third-Party
        Plaintiff/Appellee,

and

DAVID SUTHERLAND,

        Third-Party Defendant.

No.   335776
Wayne Circuit Court
LC No.   14-109836-DM

---

Before:  FORT HOOD, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

In Docket No. 335776, plaintiff, Eugene Boyle, Jr. ("Gene"), appeals by right various provisions in a judgment of divorce (JOD) entered August 11, 2016, that dissolved his marriage with defendant/third-party plaintiff, Catherine Metry Boyles ("Cathy"), including the court's ordering him to pay $125,000 of Cathy's attorney fees.  During the divorce proceedings, Cathy joined David Sutherland as a third-party defendant and later brought a third-party claim against him for fraud and conspiracy.  In Docket No. 334567, Sutherland appeals by right the trial court's June 29, 2016 order requiring him to pay $40,000 of Cathy's attorney fees, as well as an earlier order in which the trial court denied his September 2015 motion for summary disposition. Cathy cross-appeals the trial court's dismissal of her third-party claim against Sutherland.  The Court consolidated these dockets for administrative efficiency.[1]  *Boyle v Boyle*, unpublished per curiam order of the Court of Appeals, entered August 3, 2017 (Docket Nos. 334567, 335776). For the reasons explained below, we reverse that part of the trial court's June 29, 2016 order requiring Sutherland to pay Cathy's attorney fees.  We affirm in all other respects.

## I.  PERTINENT FACTS AND PROCEDURAL HISTORY

The facts of the divorce case are relatively straightforward.  Gene and Cathy married in June 2007, shortly after which Cathy gave birth to the couple's child.  Both parties testified at trial to a marriage characterized by mutual physical and verbal abuse, and each party testified that the other spent too much money on his or her respective vice.  Gene filed for divorce in August 2014; at the time, he was 56 years old and Cathy was 48 years old.  The following month, the trial court entered an ex parte order requiring Gene to pay for "the marital home mortgage, taxes and utilities, his car note, and credit card indebtedness," and Cathy to "pay for her car note, child care costs and her individual needs"; the parties were "to share the cost of groceries."  Gene and Cathy continued to live in their house at 737 Lake Shore Road in Grosse Point Shores until December 2014, when Gene moved out following a domestic violence

---

[1] Gene filed his claim of appeal on November 1, 2016, and Cathy filed a cross-appeal the following month.  In early 2017, Gene filed for bankruptcy.  Upon notice of Gene's bankruptcy filing, the Court issued an order closing his appeal and Cathy's cross-appeal without prejudice, and vacating the Court's prior order consolidating the appeal and cross-appeal in the divorce case with Sutherland's appeal in Docket No. 334567.  *Boyle v Boyle*, per curiam order of the Court of Appeals entered February 15, 2017 (Docket No. 335776).  On July 14, 2017, the bankruptcy judge granted Gene's motion for partial relief from the automatic stay to pursue his appeal, and Gene filed a motion in this Court to reopen the appeal and cross-appeal.  The Court granted the motion and issued a corresponding order re-opening Docket No. 335776 and reconsolidating it with Docket No. 334567.  *Boyle v Boyle*, per curiam order of the Court of Appeals, entered August 3, 2017 (Docket No. 335776).  The parties later stipulated to dismissal of Cathy's cross-appeal against Gene.  *Boyle v Boyle*, order entered by the Chief Clerk, March 16, 2018 (Docket No. 335776).

incident. In response to Cathy's motions for temporary support, the trial court entered an order in March 2015 requiring Gene to pay Cathy $1,100 a month.

During discovery, Gene indicated in his answers to interrogatories and deposition testimony that a debt of $300,000 was owed to David Sutherland, which debt was secured by the marital home. He then produced a promissory note to substantiate his representations. The promissory note purported to have been "executed and delivered as of the 4st[sic] of January, 2013," and bore the signatures of Gene and Sutherland. The note defined the "Borrower" as Gene, and stated that if the marital home sold before the loan was paid back, the Borrower, "promises that the balance due, with interest, shall be paid in full at the closing of the Property's sale." Cathy testified that she knew nothing about any loan or promissory note until receiving the latter during the course of discovery and that she was "shocked" and "surprised" to learn of its existence. She recounted at trial that Gene had told her that Sutherland knew of a way he could use his IRA funds to buy and renovate a house without going into debt. She insisted that he did not say anything to her about a loan.

Cathy testified that when she first saw the promissory note, she thought she and Gene owed Sutherland $300,000. However, on or around June 6, 2015, a computer expert hired to examine her home computer discovered that Gene had actually created the demand promissory note on March 24, 2014. Cathy said she then began to see the note as an attempt to defraud her of her property rights in the marital home. Her unsupported testimony that Gene sent her a letter in January 2014 indicating that he was not going to live "this way" any more and that he wanted out of the marriage implied that Gene had drafted the promissory note in contemplation of divorce. Gene acknowledged at trial that he drafted the note in March 2014, but insisted that he did not draft it with divorce in mind. He said he created the note because he was concerned that if the IRS audited him, it would view his investment in Palms Land, LLC, as a distribution from his IRA. He also acknowledged that he presented the note as a marital lien in answers to interrogatories and during his deposition, saying that he did so because that is what he believed it to be.

Ten days after discovering the true date upon which Gene created the promissory note, and a week prior to the start of a bench trial in the divorce case, Cathy filed a motion to amend her answer to Gene's complaint and for leave to file a third-party complaint to join Sutherland as a necessary party. She alleged that the $300,000 was not a loan at all, and that Gene and Sutherland had authored documents to make it look like Gene had an interest in an LLC owned by Sutherland when in fact Gene had merely liquidated his IRA. Claiming that this scheme interfered with her property rights, she proposed to bring counts of fraud and conspiracy against both Gene and Sutherland. The court granted the motion. The parties reached agreement on child custody, parenting time, and related issues after the first day of trial, and the court urged them to reach agreement on their outstanding issues. However, no agreement was forthcoming. In August 2014, Cathy filed a third-party complaint against Sutherland alleging fraud and conspiracy in connection with the transaction between him and Gene, and the trial dragged on for 11 more days over the next nine months.

The pivotal issue on appeal is the effect of the transaction between Gene and Sutherland ("the Sutherland transaction") on the trial court's rulings. Sutherland and Gene alleged that the transaction enabled Gene to use funds from a premarital IRA to buy and renovate the couple's

home in Grosse Point Shores in a way that perfectly complied with IRS rules. Gene took $300,000 out of a premarital IRA he had at Northern Trust and transferred it to Equity Institutional because the latter permitted self-directed IRAs. From there, he used the money to purchase a 45% membership interest in Palms Land, LLC, from Sutherland, who up until that time had owned 100% of the LLC. The LLC being Sutherland's client, Sutherland deposited the $300,000 into the second of his two IOLTA accounts, IOLTA 2, which he said he used when he needed to escrow funds for transactions in which he was involved. He then took $300,000 from Palms Land, LLC in "advancements," and subsequently loaned those funds to Gene through a wire transfer of $180,000 on January 11, 2013, and a series of checks written between January 10, 2013 and September 9, 2013. The trial court and the parties referred to this transaction as "the snake," presumably because of the circuitous route the funds took from Gene's IRA back to Gene for use in the house.

Sutherland acknowledged that the money he loaned to Gene came from Gene's IRA money used to purchase a membership interest in Palms Land, LLC. He explained that the money belonged to Palms Land, LLC, once it went into the IOLTA 2 account, and insisted that the transaction met IRS requirements pertaining to IRAs and that he had made a valid loan to Gene. He testified that Equity Institutional, the custodian of Gene's IRA, approved the IRA's purchase of an equity position in an LLC as an investment, and that he was unaware of any prohibitions against an LLC advancing money to a majority member out of an IOLTA account or against that member then loaning the money to someone else. He denied that the transaction was an elaborate scheme to conceal the distribution to Gene of his IRA, insisted that Gene owes him $300,000, and said that the custodian of Gene's IRA could go after him for the money through Palms Land, LLC. Gene's testimony about the transaction was largely consistent with that of Sutherland. He acknowledged that the purpose of the transaction was to have access to his IRA money while avoiding the penalty and taxes that would be due for early withdrawal, believed that he had to repay the money for the transaction to meet the IRS's requirements, and insisted that he never intended the money to become marital property. He said the transaction had always been in contemplation of having the funds available for retirement.

Whereas Sutherland and Gene focused their explanation of the Sutherland transaction on the accounting, i.e., the paper trail, Cathy's expert, John Alfonsi, focused on the flow of the money. He opined that because there was no evidence that Sutherland ever took possession of the $300,000 from the IOLTA 2 account, Palms Land, LLC, did not advance Sutherland the money. He noted that the operating agreement for the LLC did not necessarily obligate Sutherland to return those funds, and that if the advancements were not returned, they would be treated as a distribution. It was Alfonsi's opinion that the IRS would treat Gene's alleged borrowing of money from his IRA account as a distribution. He agreed on cross-examination that it was generally permissible for an IRA to purchase equity ownership in an LLC, for a member of an LLC to receive "acceptable advancements," and for the member who received the advancements to loan that money to another person, and that a promissory note was not necessarily required. He also affirmed that the promissory note reflected the transfers to which Sutherland testified. Nevertheless, he maintained that the absence of evidence showing the flow of the funds from the IOLTA 2 to Sutherland's bank account casts doubt on the transaction. He added that, even though the individual steps in the transaction may "pass the sniff test," when viewed more carefully, each step of the transaction has potential problems, and taken together, "something doesn't look right."

In an opinion and order dated June 29, 2016, the trial court stated that it did not know whether Sutherland's use of his IOLTA 2 account violated Michigan's Rules of Professional Conduct or whether the entire transaction violated any IRS rules. Nevertheless, the court found that Gene and Sutherland made a material representation that they knew was false when they signed the promissory note representing that the marital home secured a loan from Sutherland to Gene. The court also found that Gene and Sutherland intended for Cathy and the court to rely on the contents of the note. However, the court found that Cathy had not relied on the false representation. On the contrary, she was "immediately suspicious of the promissory note and questioned the debt allegedly owned to Sutherland" and "continuously denied the validity of the loan and its transactions." The court concluded that absent reasonable, detrimental reliance, Cathy's claims for fraud and conspiracy failed. On the ground that early in the discovery process Sutherland had an opportunity to disclose the nature of the transactions with Gene and the creation of the promissory note, including the date it was actually executed, the trial court ordered Sutherland to pay $40,000 to Cathy for attorney fees. In the same opinion and order, the trial court set forth the terms of the JOD and ordered Gene to pay $125,000 to Cathy for attorney fees. After revisions were made on the request of the parties, the court entered the final JOD on August 11, 2016. This appeal followed.

II. ANALYSIS

A. DOCKET NO. 334567

Sutherland contends that, because Cathy did not prevail on her third-party claim against him for fraud and conspiracy and because the trial court did not make a finding of frivolousness, the trial court erred in relying on MCL 600.2591 and MCR 2.114 as authority for ordering him to pay Cathy's attorney fees.[2] We agree. We review for an abuse of discretion a trial court's ruling on a request for attorney fees. *Edge v Edge,* 299 Mich App 121, 127, 829 NW2d 276 (2012). We review a trial court's underlying factual findings, including frivolousness, for clear error, and issues involving the interpretation of MCL 600.2591 and MCR 2.114 de novo. *Kitchen v Kitchen,* 465 Mich 654, 661; 641 NW2d 245 (2002). A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. *Parks v Parks*, 304 Mich App 232, 237; 850 NW2d 595 (2014).

"Awards of costs and attorney fees are recoverable only where specifically authorized by a statute, a court rule, or a recognized exception." *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010) (quotation marks and citation omitted). MCL 600.2591 allows a trial court to award sanctions in the form of attorney fees and costs to the prevailing party where the nonprevailing party has asserted a frivolous action or defense. An action or defense is deemed frivolous if at least one of the following conditions is met:

---

[2] Cathy's attorney sought an award of $95,000 in attorney fees associated with the Sutherland transaction. The court awarded Cathy $80,000 for these fees, and ordered Gene and Sutherland to pay $40,000 each.

(i) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(ii) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(iii) The party's legal position was devoid of arguable legal merit.

MCR 2.114(E) requires courts to impose sanctions if a document is signed in violation of the requirements of the court rule, and, in addition to these sanctions, MCR 2.114(F) provides that "a party pleading a frivolous claim or defense is subject to costs as provided in MCR 2.625(A)(2)." MCR 2.625(A)(2) allows for the imposition of costs pursuant to MCL 600.2591. It is not clear what subsection of MCR 2.114 the court had in mind when it imposed the "attorney fees, expert fees, and costs" on Sutherland, but because there is no mention in the record of his having submitted a document in violation of the court rule, it seems reasonable to presume that the court relied on MCR 2.114(F).

The trial court erred in relying on MCL 600.2591 and MCR 2.114(F) to order Sutherland to pay Cathy's attorney fees. Both the statute and the court rule provide for an award of attorney fees to the prevailing party against the nonprevailing party. Cathy's third-party complaint contained two counts against Sutherland: one for fraud and one for conspiracy. MCR 2.625 provides that in an action involving more than one issue or count, "the party prevailing on each issue or count may be allowed costs for that issue or count." However, the trial court ruled that Cathy did not prevail on either of her counts against Sutherland. She did not prevail on her fraud count because she failed to show evidence of detrimental reliance, and because she did not prevail on her fraud count, she could not prevail on her conspiracy count. *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003) aff'd, 472 Mich 91; 693 NW2d 358 (2005) (to establish civil conspiracy, a plaintiff must first "prove a separate, actionable tort."). Thus, Cathy was not the prevailing party in her third-party complaint against Sutherland, and she is not entitled to an award of attorney fees pursuant to MCL 600.2591 or MCR 2.114(F).

Cathy argues on appeal that even though she lost her third-party claim against Sutherland, she prevailed on the entire record because the trial court viewed the $300,000 from Gene's IRA as comingled marital property and did not order the Sutherland loan repaid from proceeds from the sale of the house. However, she provides no authority for the implied proposition that, having lost her civil claim against one person, she nevertheless prevails against that person because she prevails against a different person in a different action, and we decline to search for authority to sustain her position. *Hover v Chrysler Corp*, 209 Mich App 314, 319; 530 NW2d 96 (1994) ("A party may not leave it to this Court to search for authority to sustain or reject its position."). In light of the plain language of the statute and the court rule allowing an award of attorney fees to a prevailing party, and considering that Cathy was not the prevailing party in her third-party complaint against Sutherland, we reverse that portion of the trial court's June 29, 2016 order requiring Sutherland to pay $40,000 in Cathy's attorney fees. In light of our disposition, we need not address Sutherland's remaining issue on appeal.

On cross-appeal, Cathy argues that the trial court erred in ruling that the evidence did not prove detrimental reliance sufficient to prove her third-party claims for fraud and conspiracy against Sutherland.[3] The trial court determined that because Cathy was immediately suspicious of the promissory note and questioned the debt Gene allegedly owed to Sutherland, Cathy did not establish the reliance element required to prevail in a fraud claim, and thus, her conspiracy claim also failed. Cathy contends that the trial court erred in not recognizing that "in order for the 'fraud' to work, other misrepresentations had to be made by [Gene], which, given the nature of the conspiracy, must be imputed to [Sutherland]." She claims that she relied on Gene's "true" representations that the money he used to acquire and renovate the marital home came from his IRA unencumbered, that he later made false statements characterizing the nature of the conveyance as a loan from Sutherland personally, that he meant for these representations to deceive her, and that, given the nature of the conspiracy between Gene and Sutherland, Gene's deceptive representations should be imputed to Sutherland. Cathy's argument fails to elucidate any misrepresentation that she allegedly relied upon to her detriment. Rather, she merely had to take steps to prove the falsity of the alleged loan. Moreover, Cathy's argument puts the cart before the horse by assuming a conspiracy in order to prove a fraud. As previously indicated, the law is clear that in order to establish civil conspiracy, a plaintiff must first "prove a separate, actionable tort[,]"*Advocacy Org for Patients & Providers*, 257 Mich App at 384; in this case, fraud. In short, nothing in Cathy's argument on cross-appeal persuades us to disturb the trial court's ruling that Cathy failed to establish her third-party claims for fraud and conspiracy.

## B. DOCKET NO. 335776

### 1. CALCULATION OF ANNUAL INCOME

Gene contends that there is no evidence of fraud, sham, or illegality in the Sutherland transaction or in the promissory note memorializing it, and that the trial court's impression to the contrary tainted its decisions with regard to other matters, such as the computation of his annual income for purposes of calculating child support and an award of spousal support. Gene's argument is unpersuasive. The record shows that the court calculated Gene's annual income based on income figures Gene provided and on its assessment of Gene's testimony regarding the

---

[3] "As a general rule, actionable fraud consists of the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M & D, Inc v WB McConkey*, 231 Mich. App 22, 27; 585 NW2d 33(1998).

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org for Patients & Providers*, 257 Mich App at 384.

decrease in his 2015 income. Thus, to the extent that Gene contends that the trial court clearly erred in computing his annual income, we disagree. We review a trial court's factual findings after a bench trial for clear error, and its legal conclusions de novo. *Stallworth v Stallworth*, 275 Mich App 282, 288; 738 NW2d 264 (2007). A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. *Parks*, 304 Mich App at 237. We also give due regard "to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

When calculating child support as part of a JOD, courts presumably will follow the Michigan Child Support Formula (MCSF). MCL 552.605(1) (When a court orders child support as part of a divorce judgment, it must "order child support in an amount determined by application of the [Michigan Child Support Formula]."). According to the 2013 Michigan Child Support Formula (MCSF), "[t]he first step in determining each parent's support obligation is to determine both parents' individual [net] incomes." 2013 MCSF 2. "The objective of determining net income is to establish, as accurately as possible, how much money a parent should have available for support." 2013 MCSF 2.01(B). Where, as here, income varies considerably year-to-year due to the nature of the parent's work, the court is to use "three years' information" to determine the parent's income. 2013 MCSF 2.02(B). At issue in the case at bar is whether the trial court clearly erred by excluding Gene's 2015 income from its calculation and averaging his income from 2012 through 2014 to reach an annual income of $221,555.[4] Our review of the record does not leave us with a firm and definite conviction that the trial court made a mistake. *Parks*, 304 Mich App at 237.

Two months before he and Cathy wed, Gene left Butzel Long after 17 years with the firm and opened Boyle Burdette with his friend, William "Bill" Burdette. There is no doubt that 2015 was a bad year financially for Boyle Burdette. In 2011, the firm concluded a probate dispute for a trust that was conservatively valued at $100 million (the Slavik case), for which they received approximately $400,000 in revenue in 2011 or the first part of 2012. Their firm's revenue in 2013 was $446,880, and in 2014, it was $488,157 (*Id*.). However, in 2015, the firm lost two big contingency cases into which the partners had sunk a lot of time. Burdette testified in June 2015 that they had no cases in the settlement stage, and Gene testified in October that 2015 was shaping up to be the worst year financially he had had in approximately two decades. In December, Boyle Burdette's accountant testified that Gene and Burdette had each earned approximately $67,500 in W-2 income as of November 30, 2015, and there was no money available for end-of-year distributions to the partners as additional income. Taking into account his W-2 income, a distribution, the value of his perks and benefits, and money generated from rental property, Gene's total income in 2015 was $137,613.

---

[4] Gene incorrectly assumes that the trial court included occasional gifts of money and loan forgiveness from his mother as "income." To arrive at an average annual income of $221,555, the trial court averaged what Gene reported as his income in 2012 ($343,000), 2013 ($154,499) and 2014 ($167,167).

The trial court excluded Gene's 2015 income from its calculations because Gene's "testimony led the [c]ourt to believe that he was artificially keeping his income down, and it was impacting his law partner." Of particular importance to the trial court's decision was Gene's testimony that the divorce had "incapacitated" him. Although the trial court pressed Gene for further explanation, he never clarified what effect the divorce had on his practice of law, the connection between the divorce and his revenues being "less than fifty percent of what they were," or why the divorce prevented him from having or obtaining other cases. Gene's testimony indicated that the divorce was draining his own economic resources and that it was dragging on far longer than he had anticipated. Most significantly, he suggested that his partner, Burdette, had been waiting a year and a half for him to start maximizing his earning capacity. The trial court interpreted this testimony as indicating that Gene had been restricting his business—or at the very least not doing what he was amply capable of to build it—until the divorce was over, and that it was taking far longer, and having consequences far more dire, than he had anticipated.

Granted, the trial court could have interpreted Gene's testimony about how the divorce "incapacitated" him differently. However, the record shows that the court worked closely with the parties and their attorneys for months to reach resolution of the issues involved in the divorce. It had many opportunities to assess Gene, Cathy, and Sutherland's credibility, and it found none of them entirely credible with regard to money matters. Giving proper deference to the trial court's "special opportunity to judge the credibility of the witnesses who appeared before it," MCR 2.613(C), we conclude that the trial court's factual finding that Gene contributed to the financial anomalies of 2015 by "artificially keeping his income down" was not clear error.[5]

## 2. SPOUSAL SUPPORT

Gene raises three issues with regard to spousal support. The Court reviews the trial court's decision to award spousal support for an abuse of discretion. *Loutts v Loutts*, 298 Mich App 21, 25; 826 NW2d 152 (2012). We review the trial court's factual findings for clear error. *Berger v Berger*, 277 Mich App 700, 727; 747 NW2d 336 (2008). If we conclude that the trial court's findings are not clearly erroneous, we "must then decide whether the dispositional ruling was fair and equitable in light of the facts." *Id*. We will affirm the trial court's dispositional ruling unless it is firmly convinced that it was inequitable. *Id*.

First, Gene contends that the trial court's erroneous computation of his annual income tainted its calculation of his spousal support obligation. Our conclusion that the trial court did

---

[5] The fact that 2015 was the worst year Gene had had in nearly two decades also supports the trial court's exclusion of that year from its calculation of Gene's annual income on the ground that it was an inaccurate reflection of "how much money a parent should have available for support." 2013 MCSF 2.01(B). Gene argues that the trial court's erroneous calculation of his annual income infected its calculation of his child support obligation. Having concluded that there is no error in the former, we also conclude that there is no error in the latter.

not clearly err in its calculation of his annual income renders it unnecessary for us to address this issue.

Next, Gene contends that the trial court erred in extending the status quo beyond entry of the JOD. We disagree. Pursuant to MCR 3.207(C)(5), "[a] temporary order remains in effect until modified or until the entry of the final judgment or order." Prior to entry of the final version of the JOD, Cathy filed a motion asking the trial court, among other things, to continue the temporary support order until sale of the marital house and to delay the onset of Gene's child and spousal support obligations accordingly. The trial court granted Cathy's motion and incorporated this request into the JOD. Thus, the JOD either modified the temporary support order by extending it "until the closing on the sale of the marital home" and delaying the onset of Gene's support obligations accordingly, or it included this provision in its terms, thus becoming a provision of the JOD, not a temporary order. Gene cites no authority prohibiting the trial court from doing either. In light of the particular circumstances of this divorce, we are not convinced that the trial court's ruling was inequitable. *Berger*, 277 Mich App at 727.

Finally, Gene contends that the trial court erred in denying his request for 14 months'[6] credit against his spousal support obligation, arguing that the court should not penalize him for Cathy's role in extending the proceedings beyond what was reasonably necessary by bringing Sutherland into the suit on baseless fraud and conspiracy claims. We agree that Cathy played no small part in extending the divorce proceedings. However, the argument overlooks Gene's role in expanding the "scope, duration, and expense" of the trial by claiming that he and Cathy owed Sutherland $300,000 pursuant to a promissory note that clearly obligated Gene alone. In addition, he has failed to cite any legal authority for his position, and we decline to search for authority to sustain or reject his position. *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015). Accordingly, we deem the argument abandoned. *Id*.

### 3. PROPERTY AWARD

Gene next challenges several of the trial court's decisions regarding the division of marital property. We review a trial court's factual findings regarding property division in a domestic relations case for clear error, and if we uphold the trial court's findings of fact, we must then "decide whether the trial court's dispositional ruling was fair and equitable in light of those facts." *Berger*, 277 Mich App at 718. We will affirm the trial court's discretionary ruling unless we are left with the firm conviction that the division was inequitable. *Id*. at 717-718.

Courts have broad discretion in dividing the marital estate. *Kendall v Kendall*, 106 Mich App 240, 244; 307 NW2d 457 (1981). "The goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances." *Berger*, 277 Mich App at 716-717. "The trial court need not divide the marital estate into mathematically equal portions, but any significant departure from congruence must be clearly

---

[6] Fourteen months is the time between the parties' agreement on custody, parenting time, and related issues in June 2015 and entry of the divorce in August 2016.

explained." *Id*. To reach an equitable division of marital property, a trial court should consider the following factors:

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. [*Sparks v Sparks*, 440 Mich 141, 159-160; 485 NW2d 893 (1992).]

Additional factors may be relevant given the particular circumstances of a case. *Id*. at 160.

After addressing the aforementioned factors in its opinion and order of June 29, 2016,[7] the court awarded each party their respective business, vehicle, life insurance policies, bank accounts, and personal property. The court also awarded each party half the remaining proceeds of the house after payment of the first and second mortgages, and half the value of a Northern Trust SEP IRA, plus or minus any gains or losses from the date of entry of the judgment of divorce. The court awarded Gene 100% of his Equity Institutional IRA, 100% of a Turks and Caicos Fund, LLC, all of the Slavik money earned during the marriage ($200,000),[8] any interest plaintiff may have in Palms Land, LLC, and any refunds from his 2014 and 2015 taxes. The court awarded Cathy her substantial collection of antiques, a Rolex watch that belonged to her father and a 19th century Carrera marble table, both of which the court included among Cathy's personal property, and 50% of the contingency fees realized from four specific legal actions that Gene worked on during the marriage.

With respect to debt, the court held Cathy responsible for approximately $1,000 in medical bills, and assigned all other debt to Gene. This included the $300,000 owed to Sutherland, a $50,000 increase in a line of credit at Northern Trust[9] that accrued during the marriage, and all of the former couples' credit card debt, which amounted to approximately $52,500, approximately $20,000 of which the parties admitted was marital debt. In addition, the trial court ordered Gene to pay any remaining status quo liabilities out of his half of the proceeds from sale of the marital home.

---

[7] The court considered the *Sparks* factors in the context of determining an award of spousal support. See *Myland v Myland*, 290 Mich App 691, 695; 804 NW2d 124 (2010) (among the factors to consider in determining an award of spousal support are the length of the marriage, the age and health of the parties, the contributions of the parties to the marital estate, the needs and present situation of the parties, the abilities of the parties to work, the past relations and conduct of the parties, and general principles of equity).

[8] Cathy wanted half of the Slavik money because, although Gene had the case prior to his marriage, he worked on it and earned the money during the marriage. The trial court declined to bring the money back into the marital estate.

[9] Gene had access to a line of credit at Northern Trust, secured by the Boyle Family Trust.

Gene first argues that the trial court should have awarded him half the $24,000 replacement value of a Carrera marble table because the couple repurchased it from Cathy's mother during the marriage. He also argues that the trial court erred in assigning him all of the former couple's marital credit card debt. In both instances, the trial court based its decision primarily on the life status of the parties, the needs and circumstances of the parties, and Gene's greater earning ability. The trial court found that the marble table was among Cathy's pre-marital assets, that it had changed hands during the marriage, and that Cathy and Gene had reacquired it from Cathy's mother during the marriage. The trial court also found that Cathy's monthly expenses exceeded her income, on top of which she would be responsible for tens of thousands of dollars in attorney fees, that it would take time to rebuild her business after it lapsed during the marriage, and that Gene's earning capacity was significantly greater than hers. Based on these findings, the trial court declined to reduce Cathy's portion of the property division by $12,000 or to charge her with any portion of the approximately $20,000 in acknowledged marital credit card debt because, according to the court, "[s]he had no ability to pay any other debt." Given the property available and considering that the goal of distributing marital assets is not mathematical precision but equitable distribution in light of all the circumstances, we are not left with a firm conviction that the trial court's decision regarding the table and the marital credit card debt was necessarily inequitable. See *Berger*, 277 Mich App at 717-718.

Gene also argues that the trial court should not have divided the Northern Trust SEP IRA equally. Rather, the court should have awarded him an additional $10,000 to offset the $10,000 Cathy had already received from the IRA to use in engaging a substitute attorney. Essentially, Gene is asking for reimbursement for attorney fees ordered under MCR 3.206(C).[10] He cites no authority for the proposition that the payer of attorney fees under the court rule is entitled to an offset in the division of property. The trial court determined that equal division of the IRA was proper after considering the *Sparks* factors, and, given the circumstances of this case, we see no reason to disturb that ruling.

Finally, Gene argues that the court lacked any legal or factual basis upon which to award Cathy a share of the net recovery in four cases Gene was working on at Boyle Burdette. Again, we disagree.

Income earned during the marriage is marital property even if it is received after entry of the JOD. See *Byington v Byington*, 224 Mich App 103; 568 NW2d 141 (1997) (holding that post-filing income was marital property where it was earned before the date the JOD was entered). In the case at bar, the trial court clarified that only those portions of the four cases that Gene worked on during the marriage were marital property and provided the parties with a

---

[10] MCR 3.206(C) allows a party to "request that the court order the other party to pay all or part of attorney fees and expenses related to the action or a specific proceeding . . . ." The party making the request must show that he or she is unable to bear the expense of the action while the other party is able to pay, or that the fees were incurred because of the action of the non-requesting party. MCR 3.206(C)(2); *Borowsky v. Borowsky,* 273 Mich App 666, 687, 733 NW2d 71 (2007).

means of calculating the marital share of a net contingency fee for those portions. *Id*. The case law authorizing such an award and the trial court's care in precisely defining what was subject to division does not leave us with a firm conviction that the trial court's ruling was inequitable.

## 4. ATTORNEY FEES

Finally, Gene raises several issues relative to the provision in the JOD requiring him to pay Cathy $40,000 for attorney fees pursuant to MCL 600.2591 and MCR 2.114(F),[11] and $85,000 for attorney fees pursuant to MCR 3.206(C)(a). We review a trial court's award of attorney fees for an abuse of discretion. *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2015). "Findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error; questions of law are reviewed de novo." *Stallworth v Stallworth*, 275 Mich App 282, 288; 738 NW2d 264 (2007). We will not disturb a trial court's finding that a defense was frivolous, warranting an award of costs, unless the finding was clearly erroneous. *In re Costs and Attorney Fees*, 250 Mich App 89, 94; 645 NW2d 697 (2002).

Gene first observes that MCL 600.2591 authorizes an award of fees to the prevailing party, and contends that Cathy was not the prevailing party because the trial court ruled that she failed to prove that he committed fraud and conspiracy. He further contends that even if she were the prevailing party, he did not advance a frivolous claim or defense.

It is true that Cathy did not prove that Gene committed fraud and conspiracy because Cathy had not relied on the promissory note. However, the court adopted Cathy's view of the Sutherland transaction and Gene's use of the promissory note as an attempt to have the $300,000 returned to him and deprive the court of an opportunity to evaluate and decide whether the money from the IRA had become a marital asset by paying marital bills and renovating the marital home with it. The court split the proceeds from the sale of the house equally, rather than ordering that a part of them be used to pay off the Sutherland loan. Thus, Cathy is reasonably considered the prevailing party on this issue in the divorce action. See MCR 2.625(B)(2).

In order for Cathy to be entitled to an award of costs under MCL 600.2591, the court had to find that Gene had asserted a frivolous claim or defense. As we indicated above, MCL 600.2591(3)(a) defines "frivolous" to mean at least one of the following:

> (i) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

> (ii) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

> (iii) The party's legal position was devoid of arguable legal merit.

---

[11] As we indicated elsewhere in this opinion, because the trial court imposed attorney fees, expert fees, and costs instead of a sanction, it seems reasonable to us to presume that the court relied on MCR 2.114(F) to impose costs on Gene.

This Court has indicated that a trial court may properly award attorney fees and costs to the prevailing party pursuant to MCL 600.2591 where the nonprevailing party knowingly misrepresents relevant facts, and the misrepresentation requires additional proceedings and delays resolution of the matter. See *Keinz v Keinz*, 290 Mich App 137, 143; 799 NW2d 576 (2010) (holding that, because the defendant based his initial opposition to the plaintiff's motion for increased child support on knowing misrepresentations of his income, the circuit court abused its discretion by not awarding the plaintiff attorney fees and costs pursuant to MCL 600.2591). In the case at bar, Gene admitted at trial that in his interrogatories and deposition he represented the promissory note as obligating both him and Cathy to repay Sutherland $300,000. The note, which Gene produced in discovery, states that it was "executed and delivered as of the 4st [sic] of January 2013." However, Gene also testified at trial—consistent with the terms of the promissory note—that he alone was obligated under the note, and Cathy's computer expert established that Gene had actually created the promissory note in March 2014, which was at a time when divorce was on the horizon. Thus, as was the case with the defendant in *Keinz*, Gene had no reasonable basis to believe that his initial representations regarding the promissory note were true. MCL 600.2591(3)(a)(ii). Asserting and maintaining them nonetheless resulted in increased investigation and analysis on the part of experts and Cathy's attorney, further proceedings, and delay in the resolution of the divorce action. Accordingly, we conclude that the trial court did not abuse its discretion by awarding Cathy attorney fees pursuant to MCL 600.2591, and we affirm the award against Gene of $40,000.

The trial court also ordered Gene to pay $85,000 to Cathy pursuant to MCR 3.206(C). Gene challenges this award on the ground that Cathy failed to meet her burden under the court rule to show her inability to pay and his ability to pay.

MCR 3.206(C)(1) allows a party to "request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding . . . ." The party making the request must show that he or she is unable to bear the expense of the action while the other party is able to pay. MCR 3.206(C)(2). "[A] party sufficiently demonstrates an inability to pay attorney fees when that party's yearly income is less than the amount owed in attorney fees." *Myland v Myland*, 290 Mich App at 691, 702; 804 NW2d 124 (2010). When the trial court entered the JOD, Cathy owed approximately $200,000 in attorney fees. She appears to have earned approximately $47,000 in 2015, and the JOD did not award her any significant liquid assets. The trial court deemed her income to be, with slight imputation, $60,000 annually. Thus, there is no question that she was unable to bear the expense of the divorce action.

With regard to Gene's ability to pay, the record shows that he made around $137,000 in 2015, an anomalously bad year financially. He reported his income for 2013 and 2014 as $155,000 and $167,000 respectively; his income exceeded $300,000 in 2011 and in 2012. The trial court found that he made an average annual income of $221,555. Although the JOD assigned him significant debt and no significant liquid assets, he was awarded income-producing property in the form of a rental apartment, and the record shows that he has relatively free access to cash from a line of credit at Northern Trust secured by a family trust. The trial court pointed out at one point that there were not enough assets to pay the fees generated in this case. Nevertheless, in light of Gene's greater access to cash and his significantly greater income-earning potential, we conclude that the trial court did not abuse its discretion by awarding Cathy a portion of her attorney fees pursuant to MCR 3.206(C). See *Diez v Davey*, 307 Mich App 366;

-14-

861 NW2d 323 (2014) (affirming award of attorney fees to the plaintiff where the defendant, among other things, earned substantially more than the plaintiff did and could withdraw funds from his business).

Affirmed in part and reversed in part. We do not retain jurisdiction.


/s/ Karen Fort Hood
/s/ Deborah A. Servitto
/s/ Jane M. Beckering